**Melvin REESE, as Trustee, etc., Plaintiff,**

v.

**AKAI AMERICA LIMITED, etc., et al., Defendants.**

**No. 76–2212–Civ.–WMH.**

United States District Court, S. D. Florida, Miami Division.

March 30, 1982.

---

Scott L. Baena, Stroock, Stroock & Lavan, Miami, Fla., for BSR–USA and Graybar Electric.

Hugo L. Black, Kelly, Black, Black & Earle, P. A., Miami, Fla., for third-party defendant First Nat'l Bank of Chicago.

James E. Glass, Rosenberg, Rosenberg, Reisman & Glass, Miami, Fla., for General Electric Co.

Robert B. Gosline, Shumaker, Loop & Kendrick, Toledo, Ohio, for Main Line, Inc.

Eugene C. Holloway, Batavia, N. Y., for GTE Products, Inc.

Lawrence R. Metsch, Paul, Landy, Beiley & Harper, Miami, Fla., for Emerson, RCA, Seacoast and GTE Products, Inc.

Melvin Reese, Miami, Fla., trustee/plaintiff.

Martin L. Sandler, Broad & Cassel, Miami, Fla., for Cain & Bultman.

Wakefield, Hewitt & Webster, Miami, Fla., for Melvin Reese.

HOEVELER, District Judge.

## I. PREFACE

On January 21, 1976, the following affiliated corporations filed petitions with the United States Bankruptcy Court for the Southern District of Florida ("Bankruptcy Court") seeking relief under Chapter XI of the Bankruptcy Act of 1898: Kennedy and Cohen, Inc., a Florida corporation; Kennedy and Cohen of Georgia, Inc., a Georgia corporation; Kennedy and Cohen of Ohio, Inc., an Ohio. corporation; Kennedy and Cohen of Texas, Inc., a Texas corporation; Southern Factors of Texas, Inc., a Texas corporation; and World Associates, Inc., a Florida corporation. The preceding companies (hereinafter "the bankrupts" or "Kennedy and Cohen") were adjudicated bankrupts on March 5, 1976, the date on which Melvin Reese was designated Trustee in Bankruptcy for each. On May 15, 1976, in connection with the declared bankruptcy of the above-described corporations, the Bankruptcy Court appointed Special Counsel on behalf of the Trustee for the purpose of instituting fraudulent conveyance and voidable preference actions pursuant to appropriate sections of the Bankruptcy Act. Approximately seven months later, the aforementioned counsel filed the instant action with Melvin Reese in his representative capacity as Trustee as plaintiff.

Of 25 original defendants in this cause, nine remained at the conclusion of a bench trial which began in December of 1980. Those nine, collectively referred to at trial as "the vendors," were: BSR–USA, Limited ("BSR"); Cain & Bultman, Inc.; Emerson Electric Company ("Emerson"); GTE Products Corporation ("GTE"); General Electric Company ("GE"); Graybar Electric Company ("Graybar"); Main Line, Inc.; RCA Distributing Corporation ("RCA"); and Seacoast Appliance Distributors, Inc. ("Seacoast"). A tenth trial defendant, The First National Bank of Chicago ("FNBC"),

became a party to the action following appointment by the Bankruptcy Court of additional Special Counsel on September 17, 1980, said counsel having been named on behalf of Trustee Melvin Reese for the express purpose of proceeding against FNBC pursuant to § 60(b) of the Bankruptcy Act, 11 U.S.C. § 96(b). As issues which uniquely pertain to FNBC are dispositive of this case regarding that defendant, the Court's resolution of the Trustee's suit against FNBC will be set forth separately in this opinion following discussion with respect to the other nine defendants.

Although a variety of allegations appeared in plaintiff's several complaints filed between 1976 and 1978, the trial which eventually commenced at the close of 1980 was addressed solely to the issue of voidable preferences under § 60 of the Bankruptcy Act.* Under § 60(a) of that Act, a preferential transfer (that is, the favoritism of a certain creditor) consists of a debtor:

(1) making or suffering a transfer of its property;

(2) to or for the benefit of a creditor;

(3) for or on account of an antecedent debt (resulting in the depletion of the estate);

(4) while insolvent;

(5) within four months of bankruptcy or of the original petition under Chapter X, XI, XII or XIII of the Act;

(6) the effect of which transfer will be to enable the creditor to obtain a greater percentage of his debt than some other creditor of the same class.

Each of the foregoing elements must be established before a preference can be found to exist. However, in order for a bankruptcy trustee to prevail in a suit brought to *avoid* a preference, thereby causing the return of the value of a transfer to a debtor's estate, the Bankruptcy Act further provides that a preferential transfer may not be deemed null and void without proof of an additional element, to-wit: that the creditor receiving or to be benefit-ed by the preference had reasonable cause to believe that the debtor was insolvent. *See* § 60(b). As to all of the required elements, a trustee seeking to avoid a transfer bears the burden of proving each by a preponderance of the evidence. Significantly, a debtor's intent or motive in making a preferential transfer is not controlling in determining whether such a transfer is voidable, for judicial consideration of a transferor's moral turpitude is not required by § 60(b).

## II. BACKGROUND

Kennedy and Cohen, Inc. and its affiliates operated as retail merchants of appliances. Located in various geographic areas, Kennedy and Cohen of Georgia, Kennedy and Cohen of Ohio, Kennedy and Cohen of Texas and World Associates were controlled by the Florida-headquartered "parent," Kennedy and Cohen, Inc., a Florida corporation. As the funds and assets of the four satellite companies were commingled with that of the parent, and as the business activities of the geographically-distinct entities were dominated by the Florida corporation, the affiliates may be fairly described as instrumentalities of the parent concern, Kennedy and Cohen, Inc. Notably, the officers and directors of all of the aforementioned companies were essentially identical, with the exception of World Associates and Kennedy and Cohen of Ohio.

A similar identity of officers and directors was characteristic of Southern Factors of Texas, Inc., the financing arm for the entire Kennedy and Cohen complex. Indeed, Southern Factors was formed and existed for the sole purpose of financing purchases of merchandise for resale by the Kennedy and Cohen companies. In brief, Southern Factors obtained products from suppliers such as the defendant vendors at a cost reflecting a "finance discount," subsequently transferring those goods to other facets of the Kennedy and Cohen organization unaccompanied by the price reduction. This "factoring" arrangement, as it is

---

* Although the Bankruptcy Act has been superceded by the Bankruptcy Reform Act of 1978, the instant case, filed in 1976, remains governed by the former law.

known, was not uncommon in the appliance industry during the Kennedy and Cohen era.

In 1974 Kennedy and Cohen embarked upon an expansion program and in June of that year obtained a loan in excess of twenty million dollars from The First National Bank of Chicago. The borrowed funds were acquired for the purpose of financing Kennedy and Cohen inventory. The relevant loan agreement provided in pertinent part that FNBC would receive a security interest in all Kennedy and Cohen inventory, as well as in all proceeds from the sale of that inventory, as collateral for the Kennedy and Cohen indebtedness. Further provisions of the loan agreement required that the level of borrowing by Kennedy and Cohen was not to surpass 90% of the value of eligible collateral, security which was primarily composed of inventory and accounts receivable. Additionally, Kennedy and Cohen was to maintain a minimum net worth of three million dollars.

An economic downturn began in the United States in the second quarter of 1974, a financial circumstance which coincided with the Kennedy and Cohen expansion. A brief reflection of the apparent impact of this recessionary trend upon the parties to this cause is evident in a General Electric monthly report which indicated that sales of GE products to Kennedy and Cohen in the first two months of 1975 had fallen 58% in sales volume as compared with the first two months of 1974. More dramatically, Kennedy and Cohen's net earnings for the last three quarters of 1974 were $31,000, in marked contrast to the $987,000 earned in a similar period in 1973. While detailed analysis of the causes and effects of such declines is unnecessary here, several events which occurred in 1974 and 1975 have particular significance.

First, in mid-1974, General Electric Credit Corporation ("GECC"), the major consumer credit organization upon which typical Kennedy and Cohen customers were dependent for the financing of appliance purchases, raised its rejection rate for credit applications by an extraordinary 300%—400%.

While the extent of the impact of this increase upon possible purchasers is not known, the potential pool of Kennedy and Cohen customers was undoubtedly drained by GECC's action. Additionally, on April 1, 1975, Kennedy and Cohen acquired World Associates, a former franchisee which had financial losses approximating $2,841,000 for the year ending March 31, 1975. Finally, a joint venture with Levitz Corporation proved to be an unprofitable operation for Kennedy and Cohen during the period in question.

Most of the foregoing adverse factors—the recessionary trend, the GECC action, and the Levitz operation—as well as a general inventory imbalance with respect to Kennedy and Cohen brand merchandise, were mentioned in a form letter which Kennedy and Cohen sent to its major suppliers in June of 1975. Although the letter contained an optimistic forecast regarding Kennedy and Cohen's future, it is beyond dispute that many of Kennedy and Cohen's problems were openly on the table by the early summer of 1975. When, a brief six months later, Kennedy and Cohen filed bankruptcy petitions on January 21, 1976, those problems translated into several thousand unpaid creditors and debts exceeding twenty million dollars. Despite the enormity of this financial disaster, however, the accounts which Kennedy and Cohen maintained with the vendor-defendants in this cause had been remarkably well-satisfied prior to the date of bankruptcy. A determination as to the validity of each of those satisfactions in accordance with bankruptcy law subsequently fell to this Court, a matter to which this opinion now turns.

### III. SECTION 60

#### A. INTRODUCTION

Sections 60(a) and (b) of the Bankruptcy Act evidence a policy of asset distribution that is equitable to both debtors and creditors, as well as among creditors. In brief, the combined sections command that a bankrupt should not have been able to prefer some creditors at the expense of others

immediately prior to bankruptcy. "Immediately" in terms of § 60 is deemed to be within four months of the filing of a bankruptcy petition. In the instant case, since the bankrupts' petitions were filed on January 21, 1976, the relevant preference period began to run on September 21, 1975.

None of the vendors disputed that they were creditors of the bankrupts or that payments and/or goods returned to them had been received within four months of the Kennedy and Cohen bankruptcy. They did contest plaintiff's proof regarding several other aspects of § 60, including the Trustee's position that the effect of the challenged transfers had enabled the vendors to obtain a greater percentage of their debts than other creditors of the same class. However, Trustee Melvin Reese testified that the vendors' class of unsecured creditors included over 3,000 members who had not received any money owed to them by the bankrupts. Since the vendors received transfers which amounted to at least 71% and in most cases 100% of the bankrupts' debt to them, the plaintiff sufficiently demonstrated that each of the vendors received a greater percentage of his debt than others of the same class.

The vendors also argued that the transfers made by the bankrupt were not for or on account of antecedent debts. However, none of the transactions challenged by the Trustee were entered into on a cash or C.O.D. basis, all in fact being on terms of ten days or longer. Such extensions of credit, brief though they may be, "inarguably [give] rise to an antecedent debt". *Cooper Petroleum Co. v. Hart*, 379 F.2d 777, 782 (5th Cir. 1967). Consequently, vendors' position in this regard was without merit.

While the vendors were forceful in contesting the foregoing elements of § 60(a), their most vigorous protestations related to the remaining three issues on which the plaintiff bore the burden of proof:

(1) whether the challenged transfers were the property of the bankrupts;

(2) whether the bankrupts were insolvent at the time the transfers were made; and

(3) whether each vendor had reasonable cause to believe that the bankrupts were insolvent.

The remainder of this opinion with respect to the vendors will address those issues in turn.

## B. PROPERTY OF THE BANKRUPT

Southern Factors, Inc. ("SFF"), a Florida corporation, was incorporated under the laws of the State of Florida in July, 1972. It was involuntarily dissolved by the Florida Secretary of State on September 3, 1976, by reason of its failure to file a 1975 annual report. SFF did not file a petition in bankruptcy in the United States Bankruptcy Court for the Southern District of Florida on January 21, 1976, and it has never been adjudicated a bankrupt in that Court.

The similarly named entity which did file a bankruptcy petition in the United States Bankruptcy Court for the Southern District of Florida on January 21, 1976, which was adjudicated a bankrupt on March 5, 1976, and for whom Melvin Reese was designated Trustee, was Southern Factors of Texas, Inc. ("SFT"), a Texas corporation. SFT was incorporated under the laws of the State of Texas on March 29, 1974, and two years later, on March 15, 1976, the Texas Secretary of State involuntarily forfeited its corporate charter for failure to file a franchise tax report.

Despite the dual existence of SFF and SFT, "Southern Factors" was universally known as the financing arm for Kennedy and Cohen without regard for its corporate heritage. In attempting to support a position that the foregoing corporate distinctions were significant, however, the vendors demonstrated that checks issued to them by "Southern Factors" in the four months prior to January 21, 1976, were issued in the State of Florida, and that payments and invoices issued by them to "Southern Factors" were similarly sent to that state. They further showed that other contacts

which they engaged in with "Southern Factors" were exclusively in Florida. In addition, it was clear that the assets of SFF had been assigned to SFT on or about March 21, 1974.

Based upon the separate corporate status of SFF and SFT, as well as upon their exclusive Florida contacts with Kennedy and Cohen, the vendors argued that the challenged transfers were not the property of "the bankrupts." Their position, in brief, was that each vendor had received payments from a non-bankrupt corporation (SFF), a party not represented in this action by the Trustee. It was evident from trial testimony, however, that members of the vendor group either did not know where "Southern Factors" was incorporated, "assumed" Florida was the State of incorporation, or "did not care" where the financing subsidiary had been formed. It was also clear that at all times relevant to this cause the vendors believed that they were dealing with a single entity, for they uniformly indicated that they knew "Southern Factors" was the "financing arm for the Kennedy and Cohen complex of companies." Significantly, no evidence was produced which suggested that the transfer of assets from SFF to SFT was devised and/or accomplished for the purpose of creating creditor confusion or with an intent to defraud any particular vendor.

The Trustee did not dispute the separate corporate identities of SFF and SFT but argued that these formal distinctions should be ignored. Though it is not unusual for creative defendants to insist upon judicial respect for corporate status in order to attribute liability for corporate conduct to those affiliated corporations or individuals with whom they are in privity, it is somewhat novel, as was true of the instant case, for a plaintiff suing in a representative capacity to urge that a court disregard the corporate identity of those plaintiff represents. Despite this variation, cases and commentaries which deal with the more common corporate identity problems are pertinent here.

For example, in speaking of the often-encountered situation in which defendants insist upon rigid observance of corporate boundaries in order to impose liability on others, one well-known commentator succinctly summarized the variety of judicial approaches in this area by noting that "[w]hat the formula [for disregarding corporate structures] comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result." Latty, *Subsidiaries and Affiliated Corporations*, 191 (1936). That same view which is equally relevant in the instant case was admirably expressed some years ago by a Minnesota state court which stated:

> Many cases present avowed disregard of corporate entity. [Citations omitted.] But they all come to just this—courts simply will not let interposition of corporate entity or action prevent a judgment otherwise required. Corporate presence and action no more than those of an individual will bar a remedy demanded by law in application to facts. Hence, the process is not accurately termed one of disregarding corporate entity. It is rather and only a refusal to permit its presence and action to divert the judicial course of applying law to ascertained facts. The method neither pierces any veil nor goes behind any obstruction, save for its refusal to let one fact bar the judgment which the whole sum of facts requires.

*In re Clark's Will*, 204 Minn. 574, 578–579, 284 N.W. 876, 878 (1939).

The "whole sum of facts" in the instant case requires a finding that the operation of Southern Factors of Florida, Inc. was so intermingled with that of the entire Kennedy and Cohen organization that its separate corporate identity should be disregarded and Southern Factors of Texas, Inc. deemed its alter ego. As Justice Douglas stated in analyzing whether a group of corporations were "a single enterprise":

> Mr. Justice Cardozo said in *Berkey v. Third Third Ave. R. Co.*, 244 N.Y. 84, 95, 155 N.E. 58, 61, 50 A.L.R. 599, 'Dominion may be so complete, interference so ob-

trusive, that by the general rule of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice.' That is not a complete catalogue. The several companies may be represented as one. *Apart from that is the question whether in fact the economic enterprise is one, the corporate forms being largely paper arrangements that do not reflect the business realities.*

*NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 403, 80 S.Ct. 441, 443, 4 L.Ed.2d 200 (1960) (emphasis added).

Here, the business reality regarding the corporate structure of Kennedy and Cohen is that of a singular economic enterprise which was recognized as such not only by those associated with that organization, but by those who dealt with it as well. Thus, although the vendors in this case may have communicated exclusively with the Florida portion of the Kennedy and Cohen company, the existence of the Texas corporation (SFT) and the paper transfer of assets from the Florida financing arm to that corporation are not factors which can be deemed to infringe upon the Trustee's ability to prevail in this action. To rule otherwise would not only ignore business reality but would work an injustice upon innocent third parties, *i.e.*, other non-party creditors of Kennedy and Cohen, a result which cannot be tolerated. *See Fidelity and Deposit Co. v. USAFORM Hail Pool, Inc.*, 523 F.2d 744, 758 (5th Cir. 1975). Consequently, and in light of the foregoing discussion, the transfers challenged in this matter by Trustee Melvin Reese are found to be those of the bankrupts.

## C. INSOLVENCY

None of the vendors attempted to persuade the Court that Kennedy and Cohen was a company without serious economic difficulties in 1975. Nonetheless, the vendors did argue that Kennedy and Cohen's financial status could not be categorized as insolvent before FNBC demanded payment of its 1974 loan on or about January 7, 1976. Vendor's expert insolvency witness, Mr. James O'Connor, was adamant in his opinion that Kennedy and Cohen could not have been declared insolvent based upon known factors prior to FNBC's demand. Simply stated, O'Connor's position was that as long as the FNBC loan was not "called," Kennedy and Cohen was not insolvent. O'Connor formed this conclusion in the face of the following evidence:

1) Kennedy and Cohen's loss of 5.5 million dollars for the year ending March 31, 1975;

2) Expected additional Kennedy and Cohen losses of 3.5 million dollars for the three months following March 31, 1975;

3) Technical default by Kennedy and Cohen on the FNBC loan resulting from a lack of supporting collateral as well as the existence of net worth below 3 million dollars;

4) Kennedy and Cohen's general inability to pay debts currently;

5) GECC's action in raising the rejection rate for consumer credit applications;

6) Kennedy and Cohen's acquisition of World Associates with its accompanying substantial losses;

7) An unprofitable joint venture with Levitz; and

8) A recessionary trend in the United States economy.

Despite the foregoing, O'Connor maintained that it was unclear from available information that the fair value of Kennedy and Cohen's assets did not exceed its liabilities, a formula which represents the touchstone for determining insolvency under § 60(b). Indeed, § 1(19) of the Bankruptcy Act makes it clear that a person is not deemed insolvent within the provisions of that Act unless "the aggregate of this property exclusive of any property which he may have conveyed, transferred, concealed, removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, shall not at a fair valuation be sufficient in amount to pay his debts." O'Connor refused to categorize the

FNBC loan as either an asset or a liability of Kennedy and Cohen, preferring instead to view it as a factor to be considered in assessing whether or not Kennedy and Cohen could survive as a "going concern."

Accountant Miguel Cabrera appeared as an expert witness on behalf of the Trustee. The accounting firm of which he was a member in 1975 had been retained to prepare an audit of Kennedy and Cohen books for the period ending March 31, 1975, an undertaking in which Cabrera was extensively involved. The bulk of "field work" with respect to that audit was completed in September of 1975, but an opinion resulting from the audit was not issued by Cabrera's firm prior to the filing of the Kennedy and Cohen bankruptcy petitions on January 21, 1976. Despite the absence of a formal opinion, qualified or otherwise, Cabrera was thoroughly familiar with the financial records of Kennedy and Cohen by virtue of his participation in the auditing activity.

According to Cabrera, Kennedy and Cohen was insolvent, that is, the fair value of the company's assets was less than its liabilities, on March 31, 1975. Although O'Connor was able to find fault with the manner in which Cabrera arrived at that conclusion —criticizing, for example, Cabrera's use of historical costs for measuring the value of Kennedy and Cohen inventory—Cabrera's methods were highly credible. Moreover, in contrast to O'Connor, Cabrera expressed disbelief that Kennedy and Cohen could have continued as a going concern because of the enormous losses incurred by the company, its deficit in working capital, and the loan defaults with FNBC.

Cabrera's concern was valid. While the "call" of the FNBC loan can be regarded as having figured predominantly in Kennedy and Cohen's decision to file bankruptcy petitions in January of 1976, critical factors precipitating the FNBC demand existed prior to that time; indeed, those factors existed prior to September of 1975. Thus, although there is no question that the FNBC demand was dramatic, it was an occurrence generated by exigencies such as Kennedy and Cohen's loan defaults which existed at least by June, 1975. Circumstances which surfaced after June, e.g., Kennedy and Cohen's anticipated 3.5 million dollar loss in the wake of an earlier 5.5 million dollar loss, simply made both the "call" and the demise of Kennedy and Cohen all the more predictable. As a consequence, FNBC's January demand cannot be characterized as an "intervening change" which in and of itself created Kennedy and Cohen insolvency.

In sum, while the Court respects Mr. O'Connor's analysis, Cabrera's testimony has the greater weight. Therefore, Kennedy and Cohen is deemed to have been insolvent at least by September 21, 1975, the date on which the relevant preference period began to run.

### D. REASONABLE CAUSE

■ As the Trustee carried his burden of proof with respect to all elements of § 60(a), final resolution of this action must focus upon consideration of the § 60(b) requirement that a voidable preference arises only when a creditor is found to have had reasonable cause to believe a bankrupt was insolvent at the time a challenged transfer was made. It is sufficient for a finding of "reasonable cause" under § 60(b) that a creditor or his agent had knowledge of such facts as would induce a person of reasonable prudence to make inquiry and that such inquiry would have developed facts essential to a determination of insolvency. *Clower v. First State Bank*, 343 F.2d 808 (5th Cir. 1965); *Mayo v. Pioneer Bank and Trust Co.*, 297 F.2d 392 (5th Cir. 1961); *Mizell v. Phillips*, 240 F.2d 738 (5th Cir. 1957). In other words, if facts and circumstances with respect to a bankrupt's financial condition are known to a creditor, such as would put an ordinarily prudent man upon inquiry, the creditor is charged with knowledge of the facts which such inquiry should reasonably be expected to disclose.

■ In concluding, as this Court has done, that at various times between September 21, 1975 and January 21, 1976 each of the vendors had reasonable cause to believe that Kennedy and Cohen was insolvent, consideration was given to numerous

publications, other available information, the reactions of a particular credit mana- ger, and facts and circumstances pertinent to each vendor. Of the preceding four cate- gories, three are generally applicable to all of the vendors and will be set forth initially. Thereafter, a discussion of each individual vendor will follow.

### 1. PUBLISHED INFORMATION

The publications detailed below were available to the general public between September 14, 1974 and January 21, 1976. Although the Trustee was unable to prove that each vendor had actual knowledge of every item listed, no one disputed that all were readily obtainable. This uncontro- verted accessibility is material, for it not only gives rise to an inference that Kenne- dy and Cohen's financial troubles were widely known in the appliance industry, but it also suggests that with minimal effort, any reasonably prudent businessman could have had substantial information at hand regarding the bankrupts. Thus, while the Court considered evidence of particular ven- dor subscriptions, as well as testimony re- garding knowledge of specific articles or reports, as significant, the availability of the information appearing below weighed in favor of the Trustee, for a creditor may not willfully close his eyes to that which reveals a bankrupt's condition. *See In re Schindler*, 223 F.Supp. 512, 530 (E.D.Mo. 1963). The latter proposition is merely a corollary to the § 60(b) requirement that a creditor is charged with a duty of inquiry where circumstances are such as to cause a reasonably prudent individual to make an investigation. The following items must therefore be viewed in the context of the foregoing perspective.

a. Dun and Bradstreet report, dated September 14, 1974, which reported that Kennedy and Cohen's debt was five times greater than its net worth. Significant provisions of the FNBC loan appeared in the report, including the minimum net worth and the 90% collateral security re- quirements. According to Dun and Brad- street, the 1974 condition of Kennedy and Cohen was "unbalanced."

b. Form 10–Q filed by the bankrupts with the Securities and Exchange Commis- sion ("SEC"), dated September 30, 1974, which contained the details of the FNBC loan to Kennedy and Cohen. Stockholder equity in Kennedy and Cohen was stated to be $4,411,817.00.

c. Form 10–Q filed with the SEC by the bankrupts, dated December 31, 1974, which stated that Kennedy and Cohen net earn- ings dropped from $1.09 per share in 1973 to $.03 per share in 1974. A loss of $130,000.00 resulting from a joint venture with Levitz was mentioned and the FNBC loan again described.

d. Form 8–K filed with the SEC by the bankrupts, dated February 19, 1975, which announced the merger of World Associates and Kennedy and Cohen.

e. Dun and Bradstreet report, dated March 3, 1975, which found that Kennedy and Cohen's current and total debt were both heavy. The report further stated that the company's worth was well below debt, and its condition severely unbalanced. The existence of "good trade relations" was not- ed, as was the planned acquisition of World Associates. Dun and Bradstreet efforts to contact officers and spokesmen at Kennedy and Cohen were said to be fruitless.

f. *Home Furnishings Daily* article, dated May 20, 1975, which bore the headline "K & C Net off 96.9% for nine months". This article was apparently based upon informa- tion contained in the bankrupts' Form 10–Q dated December 31, 1974.

g. Form 10–Q filed by the bankrupts with the SEC for the quarter ending March 31, 1975 (stamped June 30, 1975), which reported that significant Kennedy and Co- hen losses were anticipated and that Kenne- dy and Cohen would merge with World Associates, assuming World's debts. This 10–Q also reported a loss from Kennedy and Cohen's joint venture with Levitz, problems with GECC, and declining sales. In addi- tion, the SEC filing indicated the existence of a deficit with respect to the collateral designed to secure the loan with FNBC and

stated that Kennedy and Cohen "may not" be in compliance with the net worth restrictions of the loan.

h. *Wall Street Journal* article, dated July 7, 1975, which contained the headlines "Kennedy and Cohen says it had fiscal 1975 loss, asks delay on report". The article stated that Kennedy and Cohen anticipated "significant" losses, although the company reported improved sales in June which was described as a "turnaround" month. The article further noted that the company expected sales to improve throughout the year.

i. *Home Furnishings Daily* article, dated July 8, 1975, which also reported Kennedy and Cohen's anticipated losses. According to this article, the company declined to give specific information on the predicted loss.

j. Dun and Bradstreet report dated September 16, 1975, which reported increased sales and profits for Kennedy and Cohen from 1972 through 1974. However, this report described the (then) current condition of the company as follows: "Worth is well below debt. Thus condition is severely unbalanced." The report included the optimistic forecasts contained in the *Wall Street Journal* article of July 7, 1975.

k. *Wall Street Journal* article, dated November 7, 1975, which was captioned: "Kennedy and Cohen had a 5.5 million dollar net loss in March 31, 1975 fiscal year." Although the article reported that the company had a profitable second quarter and anticipated its most profitable quarter, Kennedy and Cohen's default on the bank loan and negotiations to rectify that problem were also mentioned.

l. Dun and Bradstreet report, dated November 10, 1975, which contained information similar to that in the *Wall Street Journal* article of November 7, 1975.

m. *Wall Street Journal* article, dated November 25, 1975, which announced that Kennedy and Cohen had filed suit against GECC. The suit claimed losses of ten million dollars due to GECC's credit cutbacks.

n. *Home Furnishings Daily* article, dated November 26, 1975, which was headlined "Nine Kennedy and Cohen Satellites to close." The article described various cutbacks in Kennedy and Cohen's operations. It also reported the company's statements regarding a first quarter (fiscal quarter ending June 30) loss, a profitable second quarter, and a third quarter which was expected to be "the most profitable" in 18 months.

o. Form 8–K filed with the SEC by the bankrupts in November, 1975, which provided details of the 5.5 million dollar loss and the technical default in regard to the FNBC loan.

p. Form 8–K filed with the SEC by the bankrupts in December, 1975, which described the lawsuit filed against GECC, World Associate's intervention in that suit, and GECC's damage claim against World for three million dollars.

q. *Wall Street Journal* article, dated January 9, 1976, which announced that Kennedy and Cohen had received a Notice of Default from the First National Bank of Chicago.

Although brief references will be made to the foregoing items in subsequent discussions involving the individual vendors, the contents of each will not be set forth again.

## 2. OTHER AVAILABLE INFORMATION .

Much of the information contained in the foregoing published materials was available to the vendors through other sources. As previously mentioned, for example, a form letter dated June 23, 1975, was mailed by Kennedy and Cohen to the major suppliers of the bankrupts. All nine vendors with the exception of BSR acknowledged receipt of this correspondence. The letter outlined factors that Kennedy and Cohen management perceived as having adversely affected the profitability of the company, those factors being as follows:

a. The 300%—400% increase in the rejection rate of consumer credit applications by GECC;

b. A substantial increase in the finance surcharge on credit contracts which were financed;

c. The general economic recession;

d. An imbalance of inventory with almost four million dollars of Kenco and/or Romex merchandise; and

e. The unprofitable Levitz operation.

Despite the foregoing, the June letter projected an optimistic forecast for Kennedy and Cohen, prophesizing that the "most profitable period" was ahead for the company. The letter contained an invitation to a meeting in Miami with the bankrupts on an individual basis, and, in fact, each vendor did meet with Kennedy and Cohen representatives at various times throughout the summer of 1975. Although testimony was often conflicting as to the particular matters discussed at these gatherings, it is most probable that both "pluses and minuses" of Kennedy and Cohen's financial condition were aired in much the same manner as they were presented in the June letter. It is reasonable to infer, therefore, that the vendors viewed whatever favorable projections were made by the bankrupts at that time in light of known detrimental factors. As a consequence, any optimistic financial representations made by the bankrupts should not have controlled the vendors' responses to the Kennedy and Cohen situation, for the accuracy of such forecasts was obviously open to question. *See, e.g., Seligson v. Roth*, 402 F.2d 883, 887 (9th Cir. 1968); *Employers Mutual Cas. Co. v. Hinshaw*, 309 F.2d 806, 808–810 (8th Cir. 1962).

In addition to the June letter, the chief financial officer of Kennedy and Cohen, Abraham Kugel, called the various vendors during the first week of November, 1975, to inform them that the company's loss as of March 31, 1975, would be reported in the press. As previously noted, the amount of that loss was 5.5 million dollars. Those vendors who may have been unaware of the published material in this regard were thus directly informed by the bankrupts. Moreover, other former officers and/or employees of Kennedy and Cohen, Nat Lipton, Barry Mael and Frank Doria, testified that they had discussed the financial problems of the company with the vendors during 1975, although none was able to specify the dates of such discussions.

## 3. KNOWLEDGE OF A REASONABLY PRUDENT BUSINESSMAN

The record in this cause reflects responses to the Kennedy and Cohen situation by one credit manager whose corporate employer was not a trial party, such testimony having been offered by the Trustee to establish the state of mind of a "reasonably prudent" businessman dealing with the bankrupts prior to 1976. Pertinent portions of the testimony of William Naylor, Credit Manager of Whirlpool Corporation (a former defendant in this action) were as follows:

a. Naylor indicated that as early as September of 1974 he was concerned about Kennedy and Cohen's debt structure. He was fearful that Kennedy and Cohen might experience financial difficulties, or even go out of business, and he decided to watch the account closely. By October of 1974, Naylor stated that he was "greatly disturbed" when viewing the financial situation of Kennedy and Cohen.

b. In assessing information known by May of 1975 regarding the bankrupts, Naylor stated, "I would be an idiot not to be concerned." Naylor acknowledged that whenever a corporate customer of Whirlpool's was losing money he had some concern about bankruptcy resulting and, indeed, a few months prior to October of 1975, Naylor questioned Whirlpool attorneys regarding the possibility that Kennedy and Cohen payments might later be construed as preferential transfers.

c. As part of his general credit monitoring procedures, Naylor acknowledged that he contacted other creditors of Whirlpool's major accounts. With respect to Kennedy and Cohen, Naylor testified that he was in touch with Cain & Bultman, GE, GTE, RCA and Seacoast during the summer of 1975. Significantly, a Whirlpool memorandum dated August 15, 1975, revealed that Whirlpool had decided to refrain

from pressing for payment from Kennedy and Cohen so as not to create a panic which "could tip the whole thing once the word got around."

The final aspect of the preceding testimony is worth emphasizing at this juncture for it influenced the Court's consideration of certain positions taken by the vendors. Specifically, although it was evident that Naylor expended effort to contact others involved in the appliance industry as part of his normal credit monitoring responsibilities, the credit managers for other vendors in this cause (with the exception of John Blache of Emerson) either were unable to recall having acted similarly with respect to the Kennedy and Cohen situation or denied that such activity was required. Nevertheless, as Charles Hope of GTE noted, the corporate function of a credit manager is to collect information to protect company assets. Clearly, contacts with representatives of other similarly-situated businesses must be considered a part of that function, and Naylor's performance in this regard is deemed both usual and appropriate. As a consequence, the failure of virtually all credit managers associated with the vendors in this action to ascertain whether others in the appliance industry were encountering problems with Kennedy and Cohen figured importantly in the Court's evaluation of the vendors' positions that they had not, or need not, engage in such activity, as well as in the Court's consideration of the existence and availability of information which could have given rise to a determination of the bankrupts' insolvency. In short, although the vendors viewed their purported lack of industry contacts as meritorious, the Court did not.

## 4. VENDORS

The preceding catalogue of business publications and other available information, as well as the description of the reactions of a credible credit manager, serve as a backdrop for examining the relationship of each vendor with Kennedy and Cohen. In sum, the published information, readily accessible as it was, demonstrates that Kennedy and Cohen's generally unstable financial situation was widely publicized; the bankrupts' letter and various vendor communications with Kennedy and Cohen personnel indicate that much of that public information was indeed confirmed by the bankrupts. Additionally, the concerns and actions of Whirlpool Credit Manager Naylor are credited as those of a reasonably prudent businessman.

Despite the relevance of the foregoing evidence, it is insufficient to find the transfers challenged in this cause voidable without specific consideration of each vendor's association with the bankrupts. However, once it is determined that the circumstances of each vendor's relationship created a duty on the part of that vendor to investigate the bankrupts' financial condition, the previous litany of available source material evidences information which could have been uncovered with relative ease. Moreover, the available information (published and otherwise) when coupled with Kennedy and Cohen's history of slow payments, the bankrupts' inability to produce a financial statement, and other circumstances pertinent to each vendor's situation, not the least of which was the purported failure of responsible credit managers to contact others in their industry, constitute evidence sufficient to satisfy the requirement that an inquiry must be capable of producing facts essential to a determination of insolvency. As will be apparent in the discussions which follow, the foregoing analysis is applicable to every vendor in this action.

### a. *BSR*

Kennedy and Cohen was a major account for the Consumer Products Division of BSR. As of March 31, 1975, invoices from BSR to Kennedy and Cohen were past due in the amount of $23,000; by mid-June of that year, the sum had increased to $37,000. Not surprisingly, therefore, BSR placed Kennedy and Cohen on "credit hold" during the summer of 1975, *i.e.*, refused to sell the company merchandise until its account appeared to be more stable. Significantly, slow payment by Kennedy and Cohen was the pattern throughout the remainder of that year with respect to BSR invoices.

Although BSR did not acknowledge receipt of the form letter sent by Kennedy and Cohen to its major suppliers in June of 1975, representatives of the company attended a meeting in Miami at the approximate time the letter was sent to other vendors. The testimony is in conflict as to the precise scope of that meeting but Edward Johnson, a representative of Kennedy and Cohen, stated that the gathering was similar to those held with other vendors pursuant to the June letter.

By September of 1975, Victor Amador, President of the BSR Consumer Products Division, was worried about the Kennedy and Cohen account, a concern shared by Credit Manager, Ted Soderblom. Notably, during times relevant to this cause, Amador received copies of *Home Furnishings Daily*, as did Bernard Halpern, the BSR representative in Miami. John Hollands, then President, now Chairman of the Board of BSR, received the *Wall Street Journal*, and BSR maintained a subscription to Dun and Bradstreet reports.

On December 15, 1975, Halpern was advised by Kennedy and Cohen that it would not accept future shipments of BSR merchandise. The following day, December 16, 1975, Abraham Kugel directly informed BSR that Kennedy and Cohen was in default on the FNBC loan; until the FNBC problem was resolved, Kugel stated, no further BSR shipments would be received. Following this communication, no additional BSR shipments were made to the bankrupts; indeed, unsold BSR merchandise was returned to the vendor shortly thereafter.

Based upon the foregoing, the Court finds that BSR had reasonable cause to believe that the bankrupts were insolvent on or about December 16, 1975. Specifically, the Court concludes that an aggregate of the following factors constitutes sufficient proof that BSR knew or should have known of Kennedy and Cohen's insolvency by the aforementioned date: 1) Kennedy and Cohen's slow payment history with BSR; 2) the considerable financial information concerning Kennedy and Cohen which was available in published sources as well as

through communication with the bankrupts; 3) personal confirmation of the bankrupts' FNBC default by the chief financial officer of Kennedy and Cohen; and 4) the rejection by Kennedy and Cohen of shipments of BSR merchandise.

Despite the preceding conclusion, all Kennedy and Cohen payments to BSR had ceased by late November of 1975, a circumstance which results in an absence of any voidable preferences with respect to BSR insofar as that term applies to cash transfers. Nevertheless, beginning on December 26, 1975, and continuing through January 14, 1976, BSR received returns of merchandise from Kennedy and Cohen, the value of which was $39,491.50. Although BSR believed these returns were entitled to consideration as "set-offs" under applicable provisions of the Bankruptcy Act, the evidence presented in this regard was insufficient to carry BSR's burden of proof on that issue. Consequently, as this Court finds that BSR knew or had reasonable cause to believe that the bankrupts were insolvent as of December 16, 1975, preferences received by BSR in the amount of $39,491.50 are deemed to be voidable.

### b. *Cain & Bultman*

By July of 1975, a representative of Cain & Bultman, Jack Poffenbarger, had heard rumors regarding the condition of the bankrupts. As a result, Poffenbarger visited the Florida headquarters of Kennedy and Cohen to personally survey the situation. He learned that Kennedy and Cohen had just gone through a "nightmare of over-expenditures and economic mishaps."

During the same month, N. H. Sandifer, President of Cain & Bultman, met with Kennedy and Cohen personnel in response to the June 23, 1975 letter sent to all suppliers. Financial problems were discussed at that meeting, including Kennedy and Cohen's inordinate advertising expenditures and credit losses. Nevertheless, Cain & Bultman was advised that June was a turnaround month for the retailer. No current Kennedy and Cohen financial information was available, however, although Sandifer was promised that a financial statement

would be forthcoming in September. Such a statement never appeared, and Sandifer did not pursue its production. Also in July of 1975, Sandifer learned of Kennedy and Cohen's substantial losses and became aware that Kennedy and Cohen was in default on its loan with FNBC.

In mid-November of 1975, Jess Klingman, Cain & Bultman's Credit Manager, arrived in Miami for the purpose of visiting Kennedy and Cohen headquarters. Once there, Klingman demanded payment of Cain & Bultman's past due invoices. His trip (which was an unusual occurrence) succeeded, for he received immediate payment of approximately $135,000. A short time later, Cain & Bultman ceased shipments of its merchandise to Kennedy and Cohen. Payments by the bankrupts continued to Cain & Bultman until January 22, 1976, however.

Based upon the foregoing, with particular emphasis upon the slow payments which gave rise to the apparently unique Klingman trip, and the subsequent cessation of shipments of merchandise, the Court finds that Cain & Bultman had reasonable cause to believe that Kennedy and Cohen was insolvent by mid-to-late November, 1975. Therefore, Kennedy and Cohen's payments to Cain & Bultman which were received and deposited by the vendor beginning the final week in November, such transfers amounting to $83,094.24, are deemed to be voidable preferences.

### c. *Emerson*

Representatives of Emerson were familiar with the Dun & Bradstreet reports of September 17, 1974, and March 3, 1975, and acknowledged receiving the *Wall Street Journal* of July 7, 1975. Aside from these published materials, an internal memorandum dated April 7, 1975, revealed Emerson's knowledge that Kennedy and Cohen was attempting to restructure its entire operation, including a reduction of inventory, personnel and facilities. Significantly, from that date forward, John Blache, the Credit Manager of Emerson, began to monitor the Kennedy and Cohen account very closely. Indeed, after reviewing the July *Wall Street Journal article* regarding Kennedy and Cohen's anticipated financial losses, Blache's concern for the Kennedy and Cohen situation increased because he was aware of the minimum net worth requirement in the FNBC loan agreement. Blache requested financial statements from Kennedy and Cohen but none were ever provided.

In June of 1975 Emerson received the form letter prepared by Kennedy and Cohen and mailed to its major suppliers. Emerson's individual meeting which was suggested in the letter was held in July of 1975 with respect to Emerson and was attended by William Hullsiek, President of the Fisher Radio Division of Emerson.

In December of 1975, a large number of checks from Kennedy and Cohen to Emerson were returned for insufficient funds. Late in that month, Kennedy and Cohen financial officer Abraham Kugel wrote to Blache requesting Emerson's acceptance of the return of approximately $400,000 in Emerson merchandise. In a phone conversation regarding this proposal, Kugel informed Blache that Kennedy and Cohen did not have sufficient funds to cover the checks written to retire the balance owed Emerson and further indicated that Kennedy and Cohen was in a "temporary cash bind." Subsequently, merchandise returns valued in excess of $200,000 were made by the bankrupts to vendor Emerson.

In view of the foregoing, the Court finds that Emerson had reasonable cause to believe that Kennedy and Cohen was insolvent on or about December 20, 1975, the date on which Blache and Kugel discussed the concept of merchandise returns. The returns which occurred subsequent to that conversation are thus deemed to be voidable preferences. Therefore, judgment against Emerson in the amount of $230,415.54 shall be entered.

### d. *GE*

Kennedy and Cohen was among GE's top four national accounts and, because of its size, GE considered it a significant customer.

In August of 1974 GE learned that FNBC had concluded a multi-million dollar loan

with the bankrupts, advances on the loan being secured by inventory and accounts receivable as well as requiring maintenance of a minimum net worth of three million dollars. Shortly thereafter, GE received the Dun and Bradstreet report dated September, 1974, which has been previously described. GE also received Dun and Bradstreet reports for March 3, 1975; September 16, 1975; and December 2, 1975.

During March of 1975, Kennedy and Cohen experienced a severe cash flow problem which caused the company to cease purchasing GE inventory for a period of sixty days. Such a moratorium on purchases was unprecedented in GE's previous association with the bankrupts. GE also learned during this month that World Associates was in financial difficulty and that Kennedy and Cohen intended to acquire the latter company even though that acquisition would be accompanied by substantial losses.

During April, 1975, GE's Manager of National Accounts noted that in the preceding months Kennedy and Cohen had embarked on a program of increasing the number of its retail outlets although at the same time it was experiencing a significant drop in sales and imposing a moratorium on new inventory purchases. By this time Kennedy and Cohen had become extremely delinquent in its account with GE and would not provide the vendor with a commitment as to when payment would be made.

By May of 1975 GE placed Kennedy and Cohen on "national hold." This meant that none of GE's regional divisions were permitted to sell merchandise to Kennedy and Cohen pending payment of delinquent invoices. Also during May of 1975, GE learned that Kennedy and Cohen's net profits for the preceding nine-month period had dropped 96.9%. At that time, GE requested financial statements for the year ending March 31, 1975, but none were provided.

GE received the Kennedy and Cohen "form letter" on or about June 23, 1975. As previously mentioned, the letter outlined Kennedy and Cohen's financial problems as well as plans designed to improve sales and profitability.

At some point in June, GE classified Kennedy and Cohen as a "problem account." Shortly thereafter, during the first two weeks of July, 1975, Kennedy and Cohen issued a press release stating that it expected to report significant losses for its fiscal year ending March 31, 1975. This information was reported in the previously described *Wall Street Journal* article which was read by GE officials. In addition, on July 10, 1975, Melvin Landow, the Chairman of the Board of Kennedy and Cohen, advised GE that the company's then current net worth amounted to $2,500,000. This figure was obviously less than the $3,000,000 minimum net worth which Kennedy and Cohen was required to maintain pursuant to its loan agreement with FNBC.

During September of 1975, Gerald Buchanan, a GE Credit Manager, recommended that orders for merchandise from Kennedy and Cohen be refused because of credit risks. One month later, GE personnel in Houston reported that Kennedy and Cohen's delinquent invoices were substantial, that the chief financial officer was unable to prepare a check to pay GE, and that Kennedy and Cohen was "faltering." Notably, GE sales to Kennedy and Cohen at this point were 50% less than those of a similar period in the preceding year.

On November 7, 1975, GE learned from a *Wall Street Journal* article that the bankrupts had a $5.5 million net loss for the fiscal year ending March 31, 1975. The article further mentioned that Kennedy and Cohen was in default on its credit line with FNBC. Five days later, on November 12, Kennedy and Cohen reported that it anticipated an additional loss for its first quarter ending June 30, 1975.

On December 1, Kennedy and Cohen proposed that GE institute a program of field warehousing. Under the suggested arrangement, GE would ship merchandise to a designated warehouse, carrying the investment until Kennedy and Cohen sold the merchandise at retail. Subsequently, and only subsequently, GE would receive payment for its product. The proposal was declined.

On December 2, 1975, a GE internal memorandum reported that Kennedy and Cohen was deficient by over seven million dollars in maintaining collateral under the terms of its financing arrangement with FNBC. The report stated that the situation posed "a constant threat of Chapter XI proceedings which would result in practically a 100% loss to general creditors." Despite obvious recognition of the insolvent financial position of Kennedy and Cohen, GE's memorandum made reference to the possibility of future credit accommodations by GE and stated, "in other words, until we see the white of their eyes, we want to sell—our point is we want to sell merchandise." GE continued to sell merchandise to the bankrupts after December 2, 1975.

Based upon the foregoing, the Court finds that GE had reasonable cause to believe the bankrupts were insolvent on December 2, 1975. As voidable transfers totaling $418,814.67 were made after that date, that sum must be returned to the bankrupts' estate. Of the aforementioned total, $334,581.92 constitutes preferential payments, and $84,232.75 represents returns of merchandise.

As with one other vendor, GE claimed that various transfers it received were "setoffs" under the Bankruptcy Act. Similarly, however, defendant GE failed to carry its burden of proof on this issue, and judgment therefore shall be entered against it for the sum of $418,814.67.

### e. GTE

GTE began to encounter slow payments from Kennedy and Cohen, one of its top five accounts, in February, 1975. At that point GTE imposed a credit limit on Kennedy and Cohen purchases and began to monitor the account closely.

In April of 1975, a promissory note was drawn between GTE and Kennedy and Cohen for $750,000, a sum which reflected the amount the bankrupts owed the vendor. Apparently acknowledging that Kennedy and Cohen was unable to meet its current obligations with GTE, the vendor accepted the note in lieu of timely payments, the first obligation on the note being due in the fall of '75. At the same time, representatives of GTE became aware of the adverse result of the Levitz joint venture, cutbacks in personnel by Kennedy and Cohen, and the World Associates losses. Additionally, an April memo written by Credit Manager Chuck Hope revealed that GTE knew that Kennedy and Cohen was in technical default with regard to the FNBC loan.

By July, representatives of GTE were aware that Kennedy and Cohen's financial report for the fiscal year 1975 would show a loss, and discussions of this situation took place among individuals connected with the account. In an internal memo written July 2, 1975, GTE's position was characterized as "high exposure, high risk." Other internal GTE memoranda indicated that Kennedy and Cohen had advised the vendor that the "loan formula" had been exceeded by three to four million dollars.

By August, Kennedy and Cohen owed $1,200,000 to GTE. At that point, GTE refused to ship additional merchandise to the bankrupt until paid "up front."

An internal GTE memo dated August 26, 1975, reflected that Abraham Kugel of Kennedy and Cohen had advised Herman Gerbig of GTE that Kennedy and Cohen would be unable to pay the first installment on the promissory note. The memo further noted that Kugel also had stated that Kennedy and Cohen was under-collateralized with the bank. Shortly thereafter, on September 23, 1975, representatives of both Kennedy and Cohen and GTE met regarding a payment due in October. Handwritten notes by GTE financial officer Frank Strouse relating to the meeting stated: "If we present 10/75—it will default. Then bank and suppliers get spooked and that's it."

A subsequent Frank Strouse memorandum dated November 20, 1975, contained notes for use at another meeting between GTE and the bankrupts. Points of discussion included Kennedy and Cohen's $600,000 past due account, GTE's receipt of post-dated Kennedy and Cohen checks, bonded warehousing arrangements, and GTE's po-

tential recovery of part of a million-dollar tax rebate expected by Kennedy and Cohen. Additional notes made during the meeting indicated that GTE was clearly aware of Kennedy and Cohen's serious financial difficulties. Significantly, Strouse's notes demonstrated that GTE was considering limiting Kennedy and Cohen to C.O.D. purchases.

Although GTE characterized many of its endeavors with the bankrupts as merely business arrangements beneficial to both parties, it is evident that the vendor engaged in these arrangements in an effort to protect its own financial position. While there is no fault to be found with such an effort, if it is done with knowledge of insolvency, it falls within the confines of § 60(b). Thus, although this Court does not construe Kennedy and Cohen's inability to pay its debts currently in the late spring of 1975 and GTE's subsequent structuring of a promissory note to deal with this inability as evidence of GTE's knowledge of the bankrupts' insolvency, the failure of Kennedy and Cohen to meet its obligations on the note in the fall of 1975 begins to reverse that perception. By November 20, 1975, therefore, when GTE considered limiting Kennedy and Cohen to C.O.D. purchases and looked to possible tax rebates for payments, it is clear that GTE was aware of the bankrupts' insolvent position. While it is also clear that GTE received and reviewed many of the Dun and Bradstreet reports pertinent to this cause, as well as several of the *Wall Street Journal* and *Home Furnishings Daily* articles, the latter evidence pales in comparison to the special circumstances surrounding the relationship between GTE and Kennedy and Cohen.

Based upon the foregoing, this Court finds that GTE had reasonable cause to believe that the bankrupts were insolvent on November 20, 1975. Preferences received from that date forward in the sum of $991,277.98 are therefore deemed voidable.

#### f. *Graybar*

Graybar Electric Company was familiar with the Dun and Bradstreet reports of September 17, 1974 and March 3, 1975, as well as with the *Wall Street Journal* article of July 7, 1975. Graybar representatives had heard rumors that Kennedy and Cohen was contemplating filing for bankruptcy as early as January of 1975, and, by late April of that year, had obtained information from FNBC that Kennedy and Cohen was operating at a loss. FNBC also informed Graybar that World Associates, a Kennedy and Cohen franchise, had a "catastrophe" and was merging with the bankrupts.

Subsequently, Graybar received the now-familiar Kennedy · and Cohen form letter dated June 23, 1975. As was the case with the other vendors, Graybar representatives attended a meeting in Miami to discuss the factors outlined in the letter. On November 6, 1975, Kennedy and Cohen advised Graybar of its $5.5 million loss for the year ending March 31, 1975. The *Wall Street Journal* article of November 7, 1975, also reported the loss and stated that Kennedy and Cohen was in default on a $21.7 million credit line with FNBC.

On November 19, 1975, a representative of FNBC advised Graybar that the FNBC loan arrangement with Kennedy and Cohen was in default and that the bank was overextended. The FNBC representative further indicated that the bank could not venture a firm comment that Kennedy and Cohen would survive "other than in some form." The following day Graybar imposed a credit limit upon Kennedy and Cohen, restricting its purchases to a small line.

Based upon the foregoing, the Court finds that Graybar Electric Company had reasonable cause to believe that Kennedy and Cohen was insolvent on November 19, 1975. Voidable preferences in the amount of $173,520.09 therefore exist.

#### g. *Main Line*

Main Line, an RCA distributor, handled Kennedy and Cohen purchases on terms of "net-15 days." Leonard Cohan, President of Main Line, conceded that occasionally those terms were not respected by the bankrupts.

Representatives of Main Line reviewed the September 17, 1974 Dun and Bradstreet

report in addition to the Dun and Bradstreet reports of March 3, 1975; November 10, 1975; and December 2, 1975. Main Line representatives also saw the *Home Furnishings Daily* articles of May 20, 1975; July 8, 1975; November 12, 1975; November 24, 1975; and November 26, 1975.

In February of 1975, Cohan became aware of the financial problems of World Associates prior to its merger with Kennedy and Cohen. In June of that year, Art Haas, Credit Manager of Main Line, wrote to Southern Factors, Inc. requesting a financial statement. There is no evidence that such a statement was ever prepared. In July, Cohan met with Mel Landow in Cleveland at the approximate time that other meetings with individual vendors were taking place in Miami in response to the June form letter. By August 1975, Main Line was demanding that Kennedy and Cohen pay certain invoices no later than August 30, 1975. Those invoices remained unpaid as of December 12, 1975. From September forward, the bankrupts did not make timely payments to Main Line.

At some point in late December, Main Line received information from a former Kennedy and Cohen employee that the company was experiencing serious difficulty. While this information may not be characterized as an "official pronouncement," when it is viewed in conjunction with the wealth of available published information and the lack of timely payments, it is sufficient to have put Main Line on notice that a duty of inquiry existed. As that inquiry would have produced facts essential to a determination that Kennedy and Cohen was insolvent, the Court finds that Main Line, Inc. had reasonable cause to believe that the bankrupts were insolvent as of December 23, 1975. Voidable preferences in the amount of $6,163.53 therefore exist, and judgment in that amount shall be entered against defendant Main Line.

### h. RCA

RCA received the Dun and Bradstreet report dated September 17, 1974, and its representatives may have seen the Dun and Bradstreet report of September 16, 1975.

Ted Singer, RCA's Credit Manager, customarily reviewed the *Wall Street Journal* and *Home Furnishings Daily*.

In March of 1975, RCA representatives learned that World Associates was merging with Kennedy and Cohen. At that point, RCA was receiving late payments from the bankrupts, and was aware that other vendors were experiencing similar treatment. Throughout 1975, Marvin Kramer of RCA discussed the Kennedy and Cohen account with his branch managers, reviewing the delinquency of the account and considering whether or not to ship merchandise.

In June of 1975, the Chicago branch of RCA which sold parts to Kennedy and Cohen, put the company's purchases on C.O.D. During that month the standard June 23, 1975 letter was mailed to Marvin Kramer who met with Mel Landow in Miami in response to the letter.

On December 2, 1975, Singer communicated with William Naylor of Whirlpool and was informed that Kennedy and Cohen was $6,000,000 in default on its loan with FNBC. Naylor also advised Singer of GTE's exposure of $1.5 million at this time. At this point, Kennedy and Cohen payments were consistently 2–3 weeks late. On December 8, 1975, RCA put Kennedy and Cohen on C.O.D. status.

Based upon the foregoing, the Court finds that RCA had reasonable cause to believe that the bankrupts were insolvent as of December 8, 1975, and that voidable preferences in the amount of $33,855.90 therefore exist. Judgment shall be entered against RCA in the preceding amount.

### i. Seacoast

Seacoast subscribed to *Home Furnishings Daily* which was reviewed by Stanley Glaser, President of Seacoast. Seacoast also subscribed to the *Wall Street Journal* which Glaser read every morning. Phillip Abel, Credit Manager of Seacoast during 1975, testified that he generally read Dun and Bradstreet reports. Indeed, the Dun and Bradstreet report of March 3, 1975, was produced by Seacoast from its files. Abel also stated that he was aware of newspaper

articles relating Kennedy and Cohen financial losses during the year 1975.

Kennedy and Cohen was generally slow in making payments to Seacoast, often taking three weeks or more; slow payments from the bankrupts began in 1974. During the summer of 1975, Abel discussed the financial difficulties of Kennedy and Cohen with Stanley Glaser and Joseph Zemsky, Seacoast's Vice-President for Finance. Seacoast was also contacted by William Naylor of Whirlpool during the summer of 1975 regarding the Kennedy and Cohen account.

On November 5, 1975, Abe Kugel called Seacoast to advise the vendor of the $5.5 million loss which was soon to be publicly reported, a circumstance which concerned Zemsky. On or about January 7, 1976, FNBC presented Kennedy and Cohen with a Notice of Default, an event reported in the *Wall Street Journal* on January 9, 1976; on January 21, bankruptcy petitions were filed on behalf of the company. Despite the latter two occurrences, Seacoast deposited a Kennedy and Cohen check on January 21, 1975, a payment which was dated January 19, 1975. Without question, Seacoast had reasonable cause to believe that Kennedy and Cohen was insolvent as of January 19, 1975, and the Kennedy and Cohen payment as of that date is clearly a voidable transfer. Judgment therefore shall be entered against defendant Seacoast in the amount of $28,910.72.

### 5. CONCLUSION

At various times between November 19, 1975 and January 21, 1976, each of the nine vendor defendants had reasonable cause to believe that Kennedy and Cohen was insolvent. The vendors' individual payment problems with the bankrupts plus the abundance of available information regarding Kennedy and Cohen's financial condition support this finding which then commands the conclusion that certain transfers of the bankrupts property to the vendors constitute voidable preferences. One further comment is required, however.

The vendors argued throughout trial that even if a duty of inquiry regarding the bankrupts had arisen with respect to any one of them, the only viable source of information to which they should have been expected to turn was the First National Bank of Chicago. As a few vendor representatives did contact the bank regarding the Kennedy and Cohen loan, and as FNBC did not respond to these inquiries either by announcing that the bank viewed Kennedy and Cohen as insolvent or by revealing that the bank might make demand on its multi-million dollar loan, the vendors contended that they could not have obtained information which would have led them to believe Kennedy and Cohen was insolvent. The vendors further suggested that FNBC representatives were sometimes "encouraging" about the bankrupts' situation.

Although appealing on the surface, the preceding argument has a fatal flaw. As was publicly well-documented, advances made by FNBC were secured by Kennedy and Cohen inventory, that is, by the very merchandise supplied by the vendors; the bank's obvious interest in the maintenance of cordial relationships between the bankrupts and the vendors therefore should have caused any prudent credit manager to be wary of information received from the bank, particularly that which could be characterized as "encouraging." Since there was sufficient evidence of Kennedy and Cohen's precarious financial position regardless of FNBC's candor, the failure of the bank to confirm the existence of Kennedy and Cohen's insolvency is not crucial to this cause. Indeed, it is apparent that armed with all other information which was available to them, the vendors each made a business judgment as to when to sever business relationships with Kennedy and Cohen; all but two had ceased shipping merchandise to the bankrupts prior to the filing of the bankrupt petitions in January of 1976. Unfortunately for each, that pivotal decision came too late to avoid § 60(b) of the Bankruptcy Act.

### IV. FNBC

On September 17, 1980, the Bankruptcy Court appointed additional Special Counsel

on behalf of Trustee Melvin Reese for the express purpose of proceeding against the First National Bank of Chicago pursuant to § 60(b) of the Bankruptcy Act. Shortly thereafter, the aforementioned counsel filed a complaint in this cause (subsequently amended) which alleged receipt of voidable preferences by FNBC from Southern Factors, Inc., a Texas corporation, in the sum of $794,377.41. Briefly summarized, the Trustee contended that FNBC's actions in applying to its loans amounts taken from Southern Factors' "cash-in-collateral" and operating accounts constituted voidable preferences.

 The appended defendant proceeded to trial with the nine vendors in December of 1980. Nonetheless, it is unnecessary here to address the specific requirements of § 60 with respect to the bank since external circumstances govern resolution of this cause as it pertains to FNBC. First, it is clear that the complaint against FNBC was untimely filed, for the applicable statute of limitations found in Section 11(e) of the Bankruptcy Act, 11 U.S.C. § 29(e), provides as follows:

> A receiver or trustee may *within two years* subsequent to the date of adjudication or within such further period of time as the Federal or State law may permit, institute proceedings in behalf of the estate upon any claim against which the period of limitations fixed by Federal or State law had not expired at the time of filing of the petition in bankruptcy . . . . (emphasis added).

This provision operates as a statute of limitations on suits brought on behalf of an estate by a trustee. If the cause of action arises under the Bankruptcy Act itself, as it does in this case, the two-year period is the maximum time which is allowed for a trustee to institute a lawsuit. This is the interpretation of 11(e) announced by the Supreme Court in *Herget v. Central Nat'l. Bank & Trust Co.*, 324 U.S. 4, 65 S.Ct. 505, 89 L.Ed. 656 (1944). *See also, Nicholas v. Publishers Collection Service, Inc.*, 320 F.Supp. 1200 (S.D.Fla.1971); *Henkin v. Rockower Bros., Inc.*, 259 F.Supp. 202 (S.D.N.Y.1966).

Section 302 of the Bankruptcy Act, 11 U.S.C. § 702, makes it clear that the foregoing statute of limitations applies in both Chapter XI and bankruptcy proceedings by stating:

> The provisions of Chapters 1 to 7, inclusive, of this title shall, insofar as they are not inconsistent with or in conflict with the provisions of this chapter (Chapter XI) apply in proceedings under this chapter . . . For the purposes of such application the date of filing of the petition in bankruptcy shall be taken to be the date of filing of an original petition under section 722 of this title, and the date of adjudication shall be taken to be the date of filing of the petition under section 721 or 722 of this title except when an adjudication had previously been entered.

The district court in *Henkin v. Rockower Bros., Inc., supra*, in applying the above statutes stated:

> Reading Section 11(e) of the Bankruptcy Act together with Section 302, it appears that the statute of limitations in Section 11(e) commences to run on the date of the filing of the Chapter XI petition, since under Section 302 the words "date of adjudication" in Section 11(e) are to be read as "date of filing of the petition."

259 F.Supp. at 204.

The record of the bankruptcy court establishes that the Chapter XI proceeding relative to this cause was filed on January 21, 1976. The suit against FNBC therefore is barred under the applicable statute of limitations because it was not filed on or before January 21, 1978. The result would be no different if the actual date of adjudication of bankruptcy, March 5, 1976, were used, rather than the constructive date of bankruptcy, January 21, 1976. If the statute began to run on March 5, 1976, then it would have expired on March 5, 1978, long before commencement of the suit by Special Counsel on September 18, 1980. Thus, even if the so-called "suspension of statute of limitations" provision for Chapter XI contained in Section 391 of the Bankruptcy Act, 11 U.S.C. § 791, is applied to toll the

running of the statute during the period that the Kennedy and Cohen Chapter XI proceeding was pending between January 21, 1976, and March 5, 1976, the result would be no different.

In sum, whether this Court relies upon the date of adjudication of bankruptcy (March 5, 1976) or the date of the Chapter XI petition (January 21, 1976), the complaint against FNBC filed by Special Counsel in September, 1980, was untimely. Moreover, neither the conduct of FNBC with respect to any judicial proceeding involving Kennedy and Cohen since January of 1976, nor any other circumstance, gives rise to application of the "equitable tolling" doctrine in this action.

■ Second, the Trustee's voidable preference against FNBC is barred by the doctrine of res judicata. Specifically, on November 14, 1977, the Bankruptcy Court entered Final Judgment in a certain adversary proceeding, *General Electric Credit Corp. v. World Associates, Inc.*, Case No. 76–97–BK–NCR–B, determining the amount, validity and priority of claims filed by the First National Bank of Chicago and General Electric Credit Corporation against the Kennedy and Cohen complex. Both the Trustee and GNBC were parties to this adversary proceeding in the Bankruptcy Court, and the Findings of Fact and Conclusions of Law entered by that Court in conjunction with the aforementioned Final Judgment stated that "the *perfected secured* indebtedness owed to [FNBC] by each of the bankrupt estates . . . is $23,152,-666.76." (Emphasis added). The Final Judgment thus establishes that FNBC is a secured creditor of Southern Factors, Inc. with a validly perfected security interest in the assets and/or proceeds of the assets of Southern Factors, Inc. As the Trustee acknowledged at trial that he was required to demonstrate that the bank was an *unsecured* creditor in order to prevail under § 60(b), and as the Bankruptcy Court's designation of FNBC as a secured creditor operates as res judicata in this action, the Trustee cannot prevail.

The controlling law in this area is found in *Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358 (5th Cir. 1972). There, in an action by an unsecured creditor against a secured creditor for alleged fraudulent representations at a creditor's meeting inducing the secured creditor to acquiesce in the arrangement rather than to initiate Chapter X proceedings, the lower court's dismissal of the complaint was affirmed on the ground that confirmation of the arrangement was res judicata as to the unsecured creditor's subsequent claim. In resolving the matter in this fashion, the Fifth Circuit stated:

> An arrangement confirmed by a bankruptcy court has the effect of a judgment rendered by a district court, *see Stoll v. Gottlieb*, 1938, 305 U.S. 165, 170–171, 59 S.Ct. 134 [136–37], 83 L.Ed. 104, and any attempt by the parties or those in privity with them to relitigate any of the matters that were raised or could have been raised therein is barred under the doctrine *res judicàta. Cromwell v. County of Sac*, 1876, 94 U.S. 351, 352, 24 L.Ed. 195; 9 Collier on Bankruptcy ¶ 9.25 p. 335 (14th Ed. 1971).
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> . . . Even though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment. [Citations omitted].

*Id.* at 360.

Thus, although it was apparent from the evidence presented at trial that the Bankruptcy Court was correct in finding that the First National Bank of Chicago is a secured creditor with regard to Kennedy and Cohen, it is also clear that this Court cannot reconsider a judgment rendered in a prior judicial forum, including a bankruptcy proceeding, in which this issue was determined. Consequently, the Trustee's voidable preference claim against FNBC is deemed barred by the doctrine of res judicata.

## V. FINIS

In considering that this cause generated four years of pretrial maneuverings, including nearly 2,000 pleadings, motions and other docket entries, as well as twenty-five

days of trial time extending over three months and hundreds of pages of trial exhibits, a (hopefully) memorable summary of the case would appear to be required. Fulfillment of the preceding proposition is perhaps demanded because § 60 has been substantially revised by the Bankruptcy Reform Act of 1978 and many of the issues raised here must already be classed as antiquities. Nevertheless, one of the trial witnesses characterized this voidable preference suit far better than the Court could do, and it thus seems appropriate that this saga should end on his succinct note. As Seacoast Credit Manager Phillip Abel eloquently concluded, with reference to the financial operations of the appliance industry, "We take risks all the time." No more fitting epitaph to this litigation could be found than that.

Separate judgments shall issue in conformity with this opinion.