### In re FRIGITEMP CORPORATION, Preference Actions.

### Lawson F. BERNSTEIN, Trustee in Bankruptcy of Frigitemp Corp., Plaintiff,

### v.

### ALPHA ASSOCIATES, INC.; Comet Travel Service; Greitzer, Inc.; Hancock Bank; Laboratory Furniture, Inc.; Joseph Lefrak, et al; Mississippi Power Company; and Traulsen & Co., Inc., Defendants.

Nos. 81 Civ. 3172 (ADS), 81 Civ. 3251, 81 Civ. 3252 and 81 Civ. 3254.

United States District Court, S.D. New York.

Nov. 29, 1983.

& Morse, Gulfport, Miss., Bond & Camhi, New York City, for Hancock Bank; Deyan Brashich, Susan Golenbock, Robert Kornreich, and Patricia Avery, Michael Silberberg, New York City, Stanford Morse, Jr., and John Harral, Gulfport, Miss., Stephen B. Camhi, New York City, of counsel.

Winthrop, Stimson, Putnam & Roberts, New York City, for Mississippi Power Co.; Julie D. Fay, New York City, of counsel.

D'Amato & Lynch, New York City, for Joseph Lefrak and Lefrak, Fischer & Myersont, Andrew R. Simmonds, New York City, of counsel.

Ballon, Stoll & Itzler, New York City, for Comet Travel Service, Julie Anne Jackson, New York City, of counsel.

Angel & Frankel, New York City, for Laboratory Furniture, Inc., John H. Drucker and Bruce Frankel, New York City, of counsel.

Kissam, Halpin & Genovese, New York City, for Traulsen & Co., Inc.; Laurence May, of counsel.

Siegel, Sommers & Schwartz, New York City, for Alpha Associates, Inc.; Harris Schwartz, New York City, of counsel.

Zimmer, Fishbach & Hertan, New York City, for Greitzer, Inc.; Robert M. Trien, New York City, of counsel.

## OPINION AND ORDER

SOFAER, District Judge:

This is the second stage of an action brought by the trustee in bankruptcy for the Frigitemp Corporation to void as preferential certain transfers made to various of Frigitemp's creditors during the period between November 20, 1977 and March 20, 1978. Frigitemp manufactured and installed interiors, furnishings, and equipment for marine and institutional construction, including refrigeration and insulation systems. Its corporate headquarters were in New York but many of the transactions in this case involved sales to Frigitemp's Gulfport, Mississippi plant. The corporation was forced to file for protection under Chapter 11 after a period of rapid growth

Bernstein, Obstfield & Schwed, New York City, Scruggs & Williams, Pascagoula, Miss., for plaintiff-trustee; Lawson F. Bernstein, Jr., Harold Obstfeld, and T. Gregory Schwed, New York City, Richard F. Scruggs and David Frazier, Pascagoula, Miss., of counsel.

Brashich & Finley, Weisenfreund & Golenbock, Wolf, Popper, Ross, Wolf & Jones, Golenbock & Barell, New York City, White

that generated severe cash flow and credit problems and culminated in its inability to complete many millions of dollars worth of construction contracts. In addition, Frigitemp officers are alleged in other actions to have engaged in fraud, misrepresentation, and bid-rigging.

The trustee in this action challenges payments made to various vendors who sold materials to Frigitemp on credit, as well as payments to a law firm, power company, and local Mississippi bank. The trustee claims that Frigitemp's trade creditors had reasonable cause to believe the company insolvent at the time the transfers were accepted. In its action against Hancock Bank, the trustee seeks recovery not only of transfers to satisfy conventional debts but also of deposits in the bankrupt's checking account applied by the bank to cover overdrafts and provisional credits. These claims raise novel issues concerning the law relating to bank payment and collection procedures as well as the law of voidable preferences.

■ After an earlier trial, Frigitemp was found to have been insolvent during the entire preference period. *Bernstein v. Pulvermacher*, No. 81–3172, slip op. (S.D.N.Y. Jan. 25, 1983). To prevail at this stage, the trustee must prove in each case that the four remaining elements of a preference were present under section 60 of the Bankruptcy Act, repealed Title 11 U.S.C.A. § 96 (West 1979), which is the governing law, rather than the new Bankruptcy Code which took effect on October 1, 1979. The Bankruptcy Act established the following five elements as necessary to void a preferential transfer: (1) the transfer must be from a debtor to a creditor for an antecedent debt; (2) it must take place while the debtor is insolvent, which has already been determined; (3) it must take place in the four month period preceding filing for bankruptcy, which is not controverted in any case at issue; (4) it must give the creditor a greater percentage of his debt than other creditors of his class; and (5) the creditor must have had reasonable cause to believe that the bankrupt was insolvent at

the time the transfer was made. 4 *Remington on Bankruptcy* § 1657 (6th ed. 1967).

One creditor, the Hancock Bank, claims that certain transfers are legitimate setoffs authorized by Bankruptcy Act § 68, repealed Title 11 U.S.C.A. § 108(a) (West 1979), were not made in payment of an antecedent debt or did not deplete the estate available for distribution among other creditors. Otherwise, all the cases at issue in this proceeding involve only the fifth element—reasonable cause to believe—which was the subject of most of the testimony and legal argument heard by the court. Over one hundred claims had originally been at issue, but by the time testimony was concluded in this case the trustee had settled with all but eight claimants. As to the remaining claims, the trustee has failed to meet its burden of proving a preferential transfer in all but its cases against Joseph Lefrak and the law firm of Lefrak, Fischer & Myersont, and against the Hancock Bank.

### I. *Constructive Notice of Insolvency.*

■ A preference is voidable if a creditor has notice of facts that would lead a prudent businessman to conclude the debtor is insolvent. *In Re Hygrade Envelope Corp.*, 366 F.2d 584 (2d Cir.1966). Moreover, a creditor is precluded from "deliberately closing his eyes so as to remain in ignorance of the debtor's condition; 'Where circumstances are such as would incite a man of ordinary prudence to make inquiry, the creditor is chargeable with notice of all facts which a reasonably diligent inquiry would have disclosed....'" *Id.* at 586. Once a creditor has actual notice of some fact or facts which ought to cause suspicion, a duty arises to make whatever inquiry a reasonably prudent person in that line of business would make. What facts should arouse suspicion, or what sort of inquiry should thereafter be made, depends on the circumstances and on the type of creditor involved. An item on an audited balance sheet which might be suspicious to a sophisticated investor will not necessarily be grounds for placing an ordinary trade creditor on notice; by the same token, an ordi-

nary trade creditor would not be expected to conduct the same sort of inquiry into a debtor's financial situation as a sophisticated lending institution should conduct. *See* Transcript at 218. The trustee contends he need not prove that a diligent inquiry would have produced information demonstrating the bankrupt's insolvency. The case law is clear, however, that "inquiry must be capable of producing facts essential to a determination of insolvency." *Reese v. Akai America, Ltd.,* 19 B.R. 83, 95 (D.C.S.D. Fla.1982). A creditor may be charged with constructive notice only of those facts which a reasonably diligent inquiry would have disclosed. *See In re Hygrade Envelope Corp.,* 366 F.2d at 586–87.

The evidence at trial showed that the overall picture of Frigitemp's financial condition known to trade creditors from November 1977 through January 1978 was not so unfavorable as to trigger a duty to investigate. Moreover, a trade creditor's reasonably diligent inquiry would not have uncovered sufficient information prior to February 1978 to lead it to conclude that Frigitemp was insolvent. Although the trustee correctly notes that balance sheet insolvency may be inferred from other indicia, the cases require substantial evidence and a sound commercial basis for a finding of reasonable cause to believe. For example, the Second Circuit in *Margolis v. Gem Factors Corp.,* 201 F.2d 803 (2nd Cir.1953) found sufficient evidence to go to the jury when a creditor knew of bank overdrafts, slow payments, and that one of the debtor's principals had taken the extraordinary step of deeding her home to the creditor as security. The creditor, who had been discounting the debtor's accounts receivable, was charged with knowledge of the fact, which could have been discovered by spot checking, that some of those accounts receivable were fictitious. In *Miller v. Wells Fargo Bank International Corp.,* 540 F.2d 548 (2d Cir.1976), a company whose balance sheet showed a net worth of $105,000 had a claim filed against it of $3 million and had agreed to pay $300,000 in settlement of another claim. The creditor bank, which had actual notice of these facts, was charged with notice of the attachment of the company's accounts in other New York banks in a suit for $4.5 million. In each of these cases, the creditor was actually aware of certain, critical information and was charged with notice of facts which were within that creditor's area of expertise, and which would have been discoverable on inquiry. As Judge Learned Hand remarked, "[t]hat creditor only the statute proscribes who dips his hand in a pot which he knows will not go round." *Kennard v. Behrer,* 270 F. 661, 664 (S.D.N.Y.1920). To conclude that a debtor is insolvent is not the same as to speculate or to harbor suspicions that the debtor is not in optimum financial condition, as the Supreme Court long ago made clear in *Grant v. National Bank,* 97 U.S. 80, 24 L.Ed. 971 (1877).

■ A corporation may be solvent for Bankruptcy Act purposes, even though it is unable to meet current liabilities, as long as the fair valuation of its assets is sufficient to meet its debts. *Cohen v. Sutherland,* 257 F.2d 737, 741 (2d Cir.1958); 11 U.S.C. § 1(19). The insolvency hearing demonstrated that Frigitemp's insolvency resulted from overstatements in its accounts receivable, including stale claims, overbilling, and the listing as assets of contracts which had become liabilities. These facts were concealed from creditors as well as the public. Moreover, Frigitemp's failure to collect on a claim based on its dispute with Ingalls Shipbuilding, a subsidiary of Litton Industries, contributed to its insolvency. The status of this claim was unclear until well into the preference period. Frigitemp had serious cash flow problems, but this was common among defense contractors. What distinguished Frigitemp in the public eye was the fact that new contracts continued to roll in, even during the preference period. A headline in the Wall Street Journal of August 29, 1978 remarked, "Frigitemp was going great guns. Then, without any warning, the firm collapsed." Facts which hindsight reveals to have been warning signs of insolvency were reasonably interpreted as temporary difficulties by Frigitemp's creditors.

■ The trustee offered ample evidence that Frigitemp was a notoriously slow payer. Many of Frigitemp's trade creditors required it to execute trade acceptances at the time they invoiced materials, to minimize the need for repeated telephone calls and letters to obtain payment. But the company's cash flow problems, its bank overdrafts, and the use of trade acceptances were typical or common among contractors in the industry, and not entitled to substantial weight as warning signs of insolvency.

Frigitemp's balance sheet for 1976, audited by the accounting firm of Arthur Anderson, and published in May 1977, showed a net worth of over $21 million, albeit with a qualifying footnote stating that $8.9 million of that sum represented an uncollected claim on Ingalls Shipyard. The trustee argued, however, that Frigitemp's creditors should have analyzed its financial reports, balance sheets, and the reports it filed with the SEC for latent evidence of insolvency. Mr. Feldman, the defendants' expert witness, testified convincingly that an ordinarily prudent businessman would not go beyond the figures and try to extrapolate numbers from a published statement. It bears noting that Frigitemp's investment bank, Hendrix, Mohr & Yardley, monitored the company's financial statements,—including its 10K and quarterly reports—throughout the preference period without becoming alarmed. Deposition of Jack B. Lyle at 19 & 27. Under the circumstances, Frigitemp's trade creditors cannot be faulted for relying on the balance sheet figures as evidence of solvency. *See Mack v. Bank of Lansing,* 396 F.Supp. 935, 942 (W.D.Mich. 1975). The same must be said of their reliance on the Dun and Bradstreet Reports during that time, which merely repeated this balance sheet information and which identified an "Up Trend" in Frigitemp's future and listed its condition as "Fair." Defendants offered proof that the Dun and Bradstreet Reports on Frigitemp had looked as bad or worse in 1972 and 1973, the years preceeding Frigitemp's most profitable period.

The other public information concerning Frigitemp was a mixture of good and bad, with the bad information beginning to predominate in late November 1977. On the positive side were: an independently conducted credit study in the summer of 1977, arranged by a consortium of banks, which led the banks to lend Frigitemp $4 million; the fact that Frigitemp predicted without contravention by Litton that its claim against Ingalls would be settled by December 30, 1977; a $42 million contract with Saudi Arabia obtained in September 1977; and a substantial contract with General Dynamics announced in October 1977. This favorable information explains why bonding companies considered Frigitemp a good risk as late as autumn 1977, and why Chase Manhattan Bank continued throughout the preference period to discount Frigitemp receivables for Alpha Associates, one of the trade-creditor defendants. On the negative side, Dun and Bradstreet in June 1977 changed Frigitemp to a "No-Rating." Although this was not unprecedented, having occurred in 1973, in December the rating included the comment, "unbalanced." The SEC Form 10Q, issued on November 18, 1977, although still showing a positive net worth, reported quarterly losses for the first time.

Frigitemp provided more detailed information to its New York bankers in connection with its loan difficulties. In November 1977, Frigitemp informed its bankers it would be unable to meet its obligation to pay $2 million of its $4 million loan on November and December 30th. It was placed in "work out" by Manufacturers Hanover Trust ("MHT") and other banks participating in the loan in an attempt to find an alternative to default, which would have precipitated a Chapter 11 filing. Furthermore, Frigitemp's cash flow problems grew steadily worse and, as found at the insolvency hearing, by mid-January 1978 an internal management study determined that Frigitemp could not complete its major contracts without losing money on them. Frigitemp's predictions of a settlement with Ingalls began to unravel in October, when it was placed under court order to continue work on the Ingalls contract. After a

meeting on January 30, 1978, General Dynamics terminated its contract with Frigitemp. Then, in February 1978, Frigitemp failed to renegotiate its contracts with National Steel and Lockheed. These were the final factors which revealed that Frigitemp's balance sheet solvency was an illusion.

Although much of this information may have been known earlier to Frigitemp's major customer Litton Industries, and to persons with access to the "work-out" sheets of Frigitemp's creditor banks, or to Frigitemp's internal management team, there is no evidence that trade creditors knew of these important developments until the end of January 1978, or that a trade creditor's inquiry within the trade would have uncovered these details of the Litton situation. In fact, one creditor called Litton in early February and asked of its experience with Frigitemp; it was told only that Litton itself was doing business with Frigitemp on trade acceptances. Transcript at 901.

The turning point for trade creditors came towards the very end of January. A Frigitemp press release of January 26, 1978 made public several critical facts: (1) that Frigitemp had negotiated waivers of its default with its lenders, but that these were subject to further approval; (2) that the Ingalls claim would not be collected in the foreseeable future; (3) that the Saudi contract would be delayed; and (4) that the company had initiated "expanded review" of all contracts as of December 31, 1977. This information, taken together with the third quarter drop in earnings and Frigitemp's loss of contracts with General Dynamics, National Steel, and Lockheed occurring about this time, would have been sufficient to warrant a conclusion by Frigitemp's trade creditors by February 1, 1978, that Frigitemp was insolvent. But the evidence at trial demonstrated that virtually all the transfers at issue occurred before February 1. Little evidence was available to trade creditors at that time to contradict the presumption of solvency created by the balance sheets. *See Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 578–79 (1st Cir.1980); *Mack v. Bank of Lansing,*

396 F.Supp. at 942. The public data reflecting the company's cash flow problems, and uncertainty regarding the Litton litigation, were counterbalanced by numerous indications of continued viability.

*Reese v. Akai America, Ltd.,* 19 B.R. 83 (D.C.S.D.Fla.1982), cited by the trustee, is apposite here because it deals with vendors selling to a long-term customer on credit and discusses the inferences such vendors should draw from published financial information and Dun and Bradstreet Reports. After outlining the massive amounts of negative information made public by the debtors in that case, including a 96.9% drop in net sales announced six months prior to the preference period, the court noted that

> [d]espite the relevance of the foregoing evidence, it is insufficient to find the transfers challenged ... voidable without specific consideration of each vendor's association with the bankrupts. However, once it is determined that the circumstances of each vendor's relationship created a duty on the part of that vendor to investigate the bankrupts' financial condition, the previous litany of available source material ... constitute[s] evidence sufficient to satisfy the requirement that an inquiry must be capable of producing facts essential to a determination of insolvency.

19 B.R. at 95.

The situation in *Reese v. Akai* differed in two major respects from the instant case. In *Reese v. Akai* any informed observer knew or should have known long before the preference period that the financial condition of the debtors was desperate. Here, Frigitemp's true financial condition was not apparent until well into the preference period. In *Reese v. Akai,* each defendant either had *actual* notice of some extraordinary circumstance, such as the debtor's default on a $20 million loan, or behaved in a manner, such as accepting returns of merchandise, that showed it was aware of the true extent of the bankrupt's difficulties. Here, the trade creditors continued to do business as usual virtually to the end, and in most

**1008**

instances no extraordinary circumstance occurred to trigger a duty to investigate.

## II. Frigitemp's Transactions with its Creditors.

### A. Greitzer, Inc.; Alpha Associates, Inc.; Traulsen & Co., Inc.

Like many vendors supplying materials to Frigitemp, these companies took trade acceptances issued at time of sale and presented for payment after a specified future date, usually thirty or sixty days thereafter. In the case of Greitzer, the only unusual circumstance brought out by the testimony was Frigitemp's lateness in executing a trade acceptance for the invoice of November 11, 1977. Mr. Greitzer's action in writing and telephoning to obtain payment was routine for the industry and is not evidence that he was on notice of Frigitemp's insolvency. The same is true for Alpha Associates and Traulsen whose credit managers also made repeated calls reminding Frigitemp of overdue accounts. This was the normal practice of those credit managers, who ordinarily spend from one third to one half of their time telephoning debtors. Transcript at 904.

The trustee has argued that the return of a trade acceptance for insufficient funds should have triggered an inquiry. But return of a single trade acceptance, quickly made good and reasonably claimed by Frigitemp personnel to have been a "mistake", is not sufficiently unusual in the construction business to trigger the extensive inquiry that would have been necessary to uncover Frigitemp's true financial condition. In the case of Alpha Associates, Frigitemp stopped payment on a trade acceptance due December 23, 1977. Plaintiff's Ex. 204. Frigitemp claimed this was a mistake and issued another trade acceptance which was paid on January 12, 1978. A trade acceptance for materials bought from Traulsen was returned unpaid on December 14, 1977. Timely payment was made by check on December 23, however, lending credibility to Frigitemp's excuse that the return of the trade acceptance was a mistake. Plaintiff's Ex. 183.

### B. Comet Travel Service, Inc.

Comet Travel supplied airline tickets and other travel services for Frigitemp personnel. Frigitemp had a history going back several years of erratic, sometimes extremely tardy payments on Comet's invoices, often made only after numerous telephone reminders from the travel agency. Frigitemp's dealings with Comet during the preference period in no respect deviated from this pattern. Carol Fox Rubenstein ("Ms. Fox"), Frigitemp's credit manager, testified that Comet continued to press for payment during the preference period, and that Frigitemp, as usual, often paid Comet late but invariably paid. Although Comet personnel called frequently urging payment, they were given no information by her on Frigitemp's plight. In fact, Ms. Fox testified that she was convinced that Frigitemp's cash flow problems were temporary and she told Comet and other creditors that there was no cause for alarm. Transcript at 193–94. Comet thus had no reason to inquire further into Frigitemp's finances. Ms. Fox also testified that Comet neither asked for nor was given preferential treatment.

### C. Mississippi Power Company.

The trustee failed to present evidence linking any responsible Mississippi Power official with notice of facts that should have triggered an inquiry. The trustee contends that publicly available information, together with repeated dunning notices and telephone calls by the public utility supplying electric power to Frigitemp's Gulfport plant are evidence of Mississippi Power's reason to suspect Frigitemp's insolvency. These calls threatening to terminate service unless overdue bills were paid represented nothing more than the usual, automated billing and collection procedures in a company with several hundred thousand customers. The use or failure of a public utility's usual collection procedures does not normally create suspicion of insolvency. In re More-Wessel, Inc., 2 Bankr.Ct. Dec. (CRR) 1646 (S.D.Ohio 1976). Strong public policy reasons exist for permitting

public utilities to bill against delinquent accounts without deeming resort to that practice as requiring further, in-depth credit inquiries. Companies with temporary cash flow problems could be thrown into avoidable bankruptcy if deprived of access to power or other utility services. Such deprivations would too readily occur if an overly stringent duty is imposed upon utilities merely because they invoke their normal billing and collection procedures for delinquent accounts.

### D. *Laboratory Furniture, Inc.*

■ Laboratory Furniture, a supplier of fixtures for Frigitemp's marine contracts, encountered more sustained payment difficulties with Frigitemp in January 1978 than any of the other trade-creditor defendants. Frigitemp stopped payment on three trade acceptances totalling over $100,000 on January 7, 1978, and these were not subsequently made good. On January 16, Frigitemp made partial payment of one trade acceptance, and timely payment of another trade acceptance which had fallen due on January 15 (Invoices 92223 and 92222). A trade acceptance originally due on January 15 was apparently extended to February 15 (Invoice 18619A). Another trade acceptance due on January 25 was paid on January 27 (Invoice 17696). The evidence suggests that, after Frigitemp stopped payment on the trade acceptances on January 7, and certainly by mid-January when only partial payment had been made on these overdue invoices, Laboratory Furniture should have been suspicious enough to inquire further into Frigitemp's solvency.

■ Laboratory Furniture argues that it was unconcerned because its jobs for Frigitemp were bonded. This is no excuse. Being protected by a performance bond does not release a creditor from the duty to inquire into the debtor's solvency once it has notice of sufficiently suspicious circumstances. *See Shaw v. Walter E. Heller & Co.,* 258 F.Supp. 394, 402 (N.D.Ga.1966), *rev'd on other grounds,* 385 F.2d 353 (5th Cir.1967) *cert. denied* 390 U.S. 1003, 88 S.Ct. 1248, 20 L.Ed.2d 104 (1968); *In re Cicha-*

*nowicz,* 247 F.Supp. 975, 977 (E.D.N.Y.), *aff'd,* 353 F.2d 538 (2d Cir.1965). The evidence indicates that Laboratory Furniture was willing to close its eyes after mid-January and go on soliciting payments from Frigitemp until the well ran dry.

The Frigitemp well ran dry almost immediately thereafter, however, for Laboratory Furniture. None of the challenged payments from Frigitemp occurred after January 27, the day before Frigitemp made public significant information on the precariousness of its financial status. Until then, an inquiry by Laboratory Furniture would not have led to notice of Frigitemp's probable insolvency which, absent inside knowledge or access to banking sources, passed from speculation to probability only at the beginning of February.

### E. *Joseph Lefrak and Lefrak, Fischer & Myersont.*

■ Joseph Lefrak, a partner in the law firm of Lefrak, Fischer & Myersont, and a certified public accountant, was elected to Frigitemp's Board of Directors at its November 1977 meeting and to the Audit Committee in January or February of 1978. By his own testimony, he attended numerous meetings between Frigitemp and its bankers in late 1977 and early 1978. During January 1978, acting for Frigitemp, he engaged the firm of Levin & Weintraub, specialists in debtor-creditor law, who assisted Frigitemp in going into Chapter 11. The trustee challenges as preferential payments totalling $52,825 made in March 1978 by Frigitemp to Mr. Lefrak's law firm for legal services rendered in the preceding months. In view of Mr. Lefrak's legal and financial sophistication and his close involvement in Frigitemp's affairs, he had constructive if not actual knowledge of Frigitemp's insolvency at the time the March transfers were made. As an insider, Mr. Lefrak had access to ample information that should have led him to conclude that Frigitemp was insolvent throughout March, so the challenged transfers are voided as preferential.

Mr. Lefrak and his firm argue that they are obligated to refund only the net of all transfers by Frigitemp minus all extensions of new credit taking place within the preference period. They suggest that, since the firm was owed less at the beginning of the preference period than at the time of bankruptcy, new credit in legal services was rendered and not paid. They also assert that their firm and Frigitemp transacted business on a running account.

These facts are relevant to several defenses against preference liability, loosely termed "the net result rule" or "running account theory" and "the subsequent advance theory." Under the classic net result rule a creditor receiving payments on a running account in the ordinary course of business with no knowledge or reason to believe in the debtor's insolvency was not obligated to refund these payments unless their net result at the time of filing was to decrease the creditor's debt exposure over that which had existed at the start of the preference period. This rule, created by the Supreme Court, mitigated the effects of Section 57(g) of the Bankruptcy Act of 1898, which required creditors to refund all transfers received within the statutory period, regardless of knowledge of insolvency, before being permitted to prove their claims in the bankruptcy proceedings. *See Joseph Wild & Co. v. Provident Life and Trust Co.,* 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003 (1909) (preferential transfers oc-

curring prior to 1903 amendment of § 57(g)); *Yaple v. Dahl-Millikan Grocery Co.,* 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904); *Jaquith v. Alden,* 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717 (1903). The effect of the net result rule was to insulate routine transactions in the normal course of business from undue disruption. Congress amended section 57(g) in 1903, to require refund of only those preferences voidable under section 60. Once the reasonable cause requirement was introduced, "[t]he reason for the [net result] rule ... disappeared...." *In re Ira Haupt & Co.,* 304 F.Supp. 917, 945 (S.D.N.Y.1969). *See Campanella v. Leibowitz,* 103 F.2d 252 (3rd Cir. 1939) (noting that the 1903 amendment of rule 57(g) undercuts the rationale behind the rule of *Yaple v. Dahl-Millikan* ).[1]

This does not mean that creditors who knowingly extend credit to an insolvent business must bear the entire burden of their generosity. Another equitable rule, often termed a "net result rule" but more accurately called the "subsequent advance theory," is codified in section 60(c) of the Bankruptcy Act, 11 U.S.C. § 96(c), and § 547 of the Bankruptcy Code, 11 U.S.C. § 547(c)(4). *See In re Rustia,* 20 B.R. 131, 135 (Bkrtcy.S.D.N.Y.1982); 4 *Remington on Bankruptcy* § 1719 (6th ed. 1957). Under the subsequent advance theory only new credit received after the preferential transfers can be netted off against them. This theory avoids penalizing creditors who, even

1. The net result rule was originally developed to mitigate the effects on routine transactions of a statutory scheme which required refund of all transfers regardless of the creditor's knowledge of the debtor's insolvency. That approach has been resurrected in the Bankruptcy Code, enacted in 1978, which requires refund of all transfers occurring within the 90 day statutory period, regardless of scienter. 11 U.S.C. § 547(b). The Code creates an exception for transfers in repayment of debts incurred in the ordinary course of business or financial affairs, when such repayment occurs within 45 days and is also in the normal course of business. 11 U.S.C. § 547(c)(2). This codifies and broadens the net result rule of the *Jaquith v. Alden* line of cases. 1A Bkr.L.Ed. Summary, § 6:219 (1981 ed.).

The notes of the Senate Committee on the Judiciary state that "[t]he purpose of this

exception is to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy."
S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978), reprinted in 9 Bkr.L.Ed., Legislative History, § 83:7 at 110 (1979 ed.), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5874. The Bankruptcy Act by contrast, required the trustee to prove constructive notice of insolvency as a threshold matter and also provided a subsequent advance rule for the creditor's protection. *Cf. In re Fulghum Construction Corp.,* 706 F.2d 171, 173 (6th Cir.1983) (net result rule incompatible with Bankruptcy Code's subsequent advance rule).

though they have knowledge of the debtor's insolvency, extend fresh credit after receiving a preferential payment. In such cases the extension of new credit is often causally related to satisfaction of the prior balance. *See, e.g., Bernstein v. Home Life Insurance Co.,* 25 B.R. 321 (D.C.S.D.N.Y.1982); *In re Stewart,* 233 F.Supp. 89 (D.Or.1964). In this Circuit, providing legal services on credit is as much an enrichment of the estate as providing goods on credit, and thus is eligible for set-off treatment under section 60(c). *In re Ira Haupt & Co.,* 424 F.2d 722 (2d Cir.1970). All of the challenged payments to Lefrak and his associates, however, relate to services rendered in February and prior months. Apart from post-petition services for which claims are pending in the Bankruptcy Court, there is no indication in the evidence submitted that Lefrak and his associates extended new credit in the form of services subsequent to the March payments by Frigitemp. *See* Plaintiff's Ex. 208 & 209. In fact, during the preference period as a whole, Lefrak's ledgers show new billings of approximately $117,800 and payments of approximately $114,800, with none of the new billings and almost half of the preferential payments occurring in March, long after Mr. Lefrak knew or should have known of Frigitemp's insolvency.

### F. The Hancock Bank.

The Hancock Bank ("Hancock") was Frigitemp's principal bank for its Gulfport, Mississippi operations. Hancock was neither an insider like Mr. Lefrak nor a financially unsophisticated trade creditor. It had access, through its New York correspondent banks, to more detailed financial information than Frigitemp's trade creditors, and its officers were in a better position to interpret that information. On the other hand, Hancock, unlike Frigitemp's New York banks, was not a participant in the loans in work-out, and thus Hancock was not kept apprised by Frigitemp of its financial difficulties. Moreover, many of Hancock's extensions of credit were closely connected to its role as Frigitemp's conduit for the payment and collection of checks.

Therefore, the special circumstances of each challenged transfer, as well as the relevant law on payment and collection, must be examined to resolve whether each was preferential.

1. *Transactions between Hancock Bank and Frigitemp.* In May 1976 Hancock made a secured loan to Frigitemp which contained a "dragnet" clause entitling Hancock to a security interest in all the equipment at designated Frigitemp plants. This loan was paid off on schedule. In September 1977, Hancock loaned Frigitemp $500,-000 on a demand note. Frigitemp maintained separate corporate and marine division checking accounts with Hancock, but the bank and its customer treated the two accounts as one for credit purposes. Hancock's established practice was to honor Frigitemp's routine, small, overdraft checks up to about $50,000. Checks entailing large overdrafts in the hundreds of thousands of dollars would be honored if Frigitemp first contacted Hancock and informed the bank that it immediately expected identified funds to cover those amounts from either the Ingalls Shipyard's progress payments or other sources; the bank would routinely check with Ingalls, moreover, to confirm that the amounts claimed by Frigitemp were in fact about to be paid through Hancock. In addition, following an accepted banking practice, Hancock routinely accorded "provisional credit" for checks deposited by Frigitemp in its accounts as permitted by the Uniform Commercial Code (hereinafter "UCC") section 4–201, reserving by law its right under UCC 4–212 to debit the account should any such check be returned by the payor bank.

On November 20, 1977, Frigitemp's marine account showed a balance of $98,891.28 and its corporate account an overdraft of $13,953.09. Throughout late November and early December Frigitemp's Hancock accounts were in active use with widely fluctuating balances. Besides routine deposits and checks, a series of debits of approximately $20,000 each were made to the account, representing scheduled payments on a promissory note purchased at Frigi-

temp's request by Hancock Bank from a Frigitemp creditor, Bagwell Coatings, Inc. The last of these payments took place as scheduled on December 19. Plaintiff's Ex. 155. On or about December 15, 1977, Frigitemp contacted Hancock to inform the Bank that it planned to deposit over $300,000 by a wire transfer from Elsters, Frigitemp's California subsidiary, and asked Hancock for clearance for an overdraft to cover a $250,000 check. The $250,000 check was paid by Hancock when presented on December 16.

On December 13, 1977, Frigitemp deposited in its corporate account at Hancock a check drawn on its New York bank, Manufacturer's Hanover Trust ("MHT"), for $250,000 and received provisional credit reducing a substantial overdraft by that amount. On December 19, Hancock's President Donald Sutter, who also served as the Frigitemp account officer, received a telephone call from MHT in New York informing him that the check of December 13 would be returned for insufficient funds. Mr. Sutter called Ms. Fox at Frigitemp to relay this information. She promised to send a wire transfer to cover the check, and claimed that the bounced check must have resulted from a "mix up" due to her alleged unfamiliarity with Frigitemp bank accounts which she was handling temporarily while her superior Mr. Heilbruner was in the hospital. Mr. Sutter had been asked earlier by Mr. Heilbruner to "look after" Ms. Fox while Heilbruner was hospitalized as she was unfamiliar with the accounts.

Later that same day, December 19, however, two checks drawn on Frigitemp's Hancock Bank account for $400,000 each, which had been deposited by Frigitemp in its account at MHT in New York, plus a third check for $30,000 to a supplier, were presented to Hancock for payment. Mr. Sutter again called Ms. Fox of Frigitemp. She again pleaded mistake and asked him to honor the checks, but did not state that she expected to receive funds to cover the checks from Ingalls or any other source. Sutter informed Ms. Fox that Hancock would not honor the checks. Sutter also spoke that day with Mr. O'Neill of MHT,

and told O'Neill that the checks would be dishonored. O'Neill replied that he was not concerned about the return of the checks, because they were supported by adequate collateral. At the time of these events, on December 19, Frigitemp's corporate account with Hancock Bank was overdrawn $306,081.54, resulting from the $250,000 check paid on December 16 plus several smaller checks, and its marine account was overdrawn $62,952.88. Hancock's records show that Frigitemp's accounts were often overdrawn in comparable amounts in the past.

The next day, December 20, Hancock received a wire transfer from Frigitemp's California subsidiary of $250,000 (as promised by Ms. Fox to cover the returned check) which it credited to Frigitemp's corporate account, reducing the overdraft in the corporate account to $56,081.54. On December 21, Hancock recorded a similar wire transfer for $315,000 (also as promised, to cover the overdraft check of December 16) converting the overdraft into a balance of $258,918.46, which was reduced to $248,918.46 by a check written the next day. On December 23, the $250,000 check drawn on MHT was returned unpaid, as expected, and Hancock debited Frigitemp's account pursuant to UCC 4–212, creating an overdraft of $1,081.54.

Mr. Sutter contacted Ms. Fox and Frigitemp's officers during the week before Christmas and was assured that the company's cash flow problems had been solved. He nevertheless arranged at that time that Frigitemp begin paying down its demand note to Hancock of $500,000. Frigitemp agreed to authorize Hancock to debit its account $50,000 weekly beginning January 9 in repayment of the note. Although Mr. Sutter initiated a credit check with a local credit company, he never directly asked Mr. O'Neill of MHT, or his contacts at other correspondent banks, about Frigitemp's general financial condition.

Between December 20, 1977 and January 9, 1978, activity in the accounts declined. On January 9 Frigitemp deposited $60,000. On the same date the account was debited

$50,000, in partial repayment of the $500,-000 demand note, as earlier agreed. These were the last transactions of any importance in the Hancock accounts. When the next $50,000 note installment became due on January 16, the balances in Frigitemp's accounts were inadequate to permit the payment.

The trustee challenges as preferential transfers all payments made to Hancock and applied to any Frigitemp "debt" during the preference period, and especially those after December 19. The trustee contends that, as of December 19, Hancock had reasonable cause to believe Frigitemp was insolvent. The trustee singles out for special attention the pay-down on December 21 of the $306,081.54 overdraft existing on December 19, the debit memo of December 23 to cover the $250,000 bounced check, and the transfer of $50,000 on January 9, in partial payment of the demand note. Hancock claims the Bankruptcy Act was not intended to reach transactions in repayment of overdrafts and provisional credits, that Hancock had no reasonable cause to believe that Frigitemp was insolvent when the transfers were made, and that in any event the net result rule should be applied to reduce its liability.

 2. *Hancock's constructive knowledge of Frigitemp's insolvency.* The critical date for reasonable cause purposes is December 19, 1977. Mr. Sutter testified that on that date he received notice that MHT would be returning a $250,000 check deposited in Frigitemp's account; that he refused to honor two Frigitemp checks for $400,000 each payable to MHT and drawn on Hancock; and that he also discussed both transactions with Mr. O'Neill of MHT but failed to question him as to Frigitemp's general financial condition. Cross deposit of checks drawn on these accounts is highly suggestive of check kiting and should certainly have aroused Mr. Sutter's suspicions; a sophisticated lending officer should not have accepted Frigitemp's excuses that these incidents were "mix-ups" without further inquiry, particularly since Mr. Sutter knew Ms. Fox had previously been involved

in handling the accounts. *See* Plaintiff's Ex. 169. Mr. Sutter implicitly recognized the significance of these transactions by refusing to honor Frigitemp's apparently kited checks, and by testifying that, as of that date, he would not have been willing to extend new credit without extensive inquiry. Transcript at 578. Mr. Sutter's decision was well-founded, since a bank that accords provisional credit suspecting that the customer is engaged in check kiting does not become a holder in due course. B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 4.12[1]. (1981). Moreover, on December 19, Hancock ordered a credit check by a local credit reporting company and sent a letter to Frigitemp requesting cross guarantees between the corporate and marine accounts. Plaintiffs Ex. 163, 159. These events, taken together, indicate that Hancock had been placed on notice and had a duty to make diligent inquiry.

Hancock argues that, even if the law obliged Mr. Sutter to inquire further on December 19, the trustee has not met his burden of proving that diligent inquiry would have developed sufficient information by the time the overdrafts were covered by deposits to establish reasonable cause to believe that Frigitemp was insolvent. *See Mack v. Bank of Lansing,* 396 F.Supp. 935, 942 (W.D.Mich.1975). The trustee, on the other hand, contends that, had Mr. Sutter pressed for further details during his telephone conversations with Mr. O'Neill, he would have been told of Frigitemp's condition, which was well known to Mr. O'Neill through his involvement in the loan work-out negotiations. Although the trustee failed to call Mr. O'Neill as a witness, and offered no testimony that these details would have been disclosed, Mr. Sutter himself testified that a correspondent bank is under an obligation to share information on matters materially affecting credit decisions. Transcript at 475. Mr. Sutter implied that Mr. O'Neill's silence lulled him into a false sense of security, which led to Mr. Sutter's failure to inquire.

■ Mr. Sutter must have known, however, that considering the longstanding correspondent relationship between Hancock Bank and several of Frigitemp's New York banks, a diligent, pointed inquiry within banking channels would have uncovered the relevant facts in short order. Mr. Sutter, in fact, testified that he would have expected a truthful answer had he directly questioned MHT as to the status of the $4,000,-000 loan. Transcript at 683. Moreover, had Hancock contacted the First National Bank of Birmingham, Alabama, which Hancock was aware was trustee on a Frigitemp bond issue, it would have discovered that the bank had been forced to advance $90,000 to cover the principal on maturing bonds because of Frigitemp's default. Transcript at 735. Thus sufficient facts concerning Frigitemp's loan defaults were available on December 19, taken in conjunction with Hancock's knowledge of the litigation between Litton and Frigitemp, to have led the bank to conclude that Frigitemp was insolvent. Hancock must be charged with constructive notice of Frigitemp's insolvency in all transactions after December 19, 1977. It remains to be determined which, if any, of the transfers from Frigitemp to Hancock after December 19 were transfers of the type prohibited under the Bankruptcy Act.

■ 3. *Hancock's Security interest under the "dragnet" clause.* Hancock contends that it held a security interest under the "dragnet" clause of an earlier loan to Frigitemp in machinery valued at $405,000 early in 1976. Theoretically, such a dragnet clause would shield any transfers in repayment of debt secured by it from preference liability, because a transfer which has the effect of reducing a secured debt does not deplete the estate. *Ricotta v. Burns Coal & Building Supply Co.,* 264 F.2d 749, 751 (2d Cir.1959); *Moskowitz v. Nelson,* 218 F.Supp. 710, 715 (E.D.Wis.1963). The "dragnet clause" secured all debts to the bank arising at any time.

The bank arguably waived reliance on this clause, however, by its failure to claim a security interest in the machinery at the original bankruptcy proceeding. Further-

more, the evidence at trial established that the security interest was worth relatively little. The equipment became dispersed and depreciated rapidly in value; half of it was sold along with the going concern in July of 1979 for $91,000. Even under the most generous valuation, the machinery was worth no more than $300,000 at the time of the alleged preferential payments, far less than Hancock's credit exposure on the $500,000 demand note alone. One could not interpret such a floating lien as securing the first $300,000 of debt repaid, since the lien represented by the "dragnet" clause remained in effect as security for "all other liabilities ... due or to become due or which may be hereafter contracted or acquired, of each Debtor ... to Bank." Defendants' Ex. I. "When the value of the security is substantially less than the secured claim ... a partial payment upon the secured claim which does not effect a release of any of the security or reduce the claim to the extent that it is effectively secured, *does* result in a depletion of the debtor's estate." *Small v. Williams,* 313 F.2d 39, 44 (4th Cir.1963) (emphasis added). At no time did Frigitemp's indebtedness to the bank decline below $300,000 and therefore Frigitemp's payments never actually reduced Hancock's security interest in the equipment.

4. *The $250,000 provisional credit.* The trustee argues that a preferential transfer occurs when a depositary bank enters a provisional credit on its books for a check drawn on another bank and deposited in a customer's account, and subsequently receives funds to cover the credit. This occurred when Hancock gave Frigitemp provisional credit on December 13 for a $250,-000 check drawn on Frigitemp's account with MHT which MHT notified Hancock on December 19 that it would not pay. The credit was "repaid" by a debit memo to Frigitemp's corporate account on December 23. The trustee claims that the bank in such situations has allowed use of its money with the risk that it will not receive final payment and, like a short term loan, this creates an antecedent debt for bankruptcy purposes. The "debt" was paid on Decem-

ber 23, after constructive notice, so the trustee contends the payment was preferential. This view greatly oversimplifies the transactions involved in the collection process of banks and, if adopted, would have undesirable effects on banking practices.

The UCC sanctions grants of provisional credit by depositary banks, see UCC 4–201, 4–212, and the practice is a common means of facilitating the speedy utilization of funds in commerce, while the collection process is underway. Banks ultimately collect virtually all checks for which provisional credit is granted. UCC 4–212, Official Comment 1. The collection process works on the theory that "no news is good news," and the depositary, collecting, and Federal Reserve banks each in turn grant provisional credits. See E. Farnsworth & J. Honnold, *Cases and Materials on Commercial Law* 136–57 (1976). These become final without any further entry if the drawee bank has not dishonored the check within a set, statutory period. See UCC 4–213 and Comments. Under the trustee's theory, however, which focuses on risk of nonpayment as the touchstone of "debt", even a provisional credit for a check that was ultimately paid would create a short-term antecedent debt. Satisfaction of the "debt," whether by debit memo where the check was dishonored, or by the firming up of the provisional credit after the UCC and Federal Reserve statutory deadline for dishonoring checks had passed, see UCC 4–212 Official Comment 1, would constitute a preferential transfer.

A provisional credit may not be equated with a mere loan on personal credit; it gives the bank the rights of a holder in due course of the negotiable instrument. UCC 4–208, 4–209; *Universal CIT Credit Corp. v. Guaranty Bank and Trust Co.*, 161 F.Supp.

790 (D.Mass.1958); Rosenthal, *Negotiability—Who Needs It?*, 71 Colum.L.Rev. 375 (1971). The depository bank which takes a check for collection acts as the depositor's agent. UCC 4–201. No actual transfer occurs until the provisional credit becomes final. UCC 4–213, Official Comment 9. See also *In re All-Brite Sign Service Co.*, 11 B.R. 409 (Bkrtcy.W.D.Ky.1981); *In re A & C Chevrolet-Olds, Inc.*, 3 B.R. 396 (D.C.E.D. Mich.1980). During the collection process, risk of loss remains with the owner of the item and not with the agent bank. *Austin National Bank v. Romo*, 598 S.W.2d 30 (Tex.Civ.App.1980) (owner not bank must absorb loss due to devaluation of peso).

Courts ordinarily construe these provisions to determine if the bank, as a holder in due course, may cut off the defenses of the drawer of the check. See, e.g., *Bowling Green, Inc. v. State Street Bank and Trust Co.*, 425 F.2d 81 (1st Cir. 1970); *Lynnwood Sand & Gravel, Inc. v. Bank of Everett*, 29 Wash.App. 686, 630 P.2d 489 (1981). But they establish a principle relevant in the preference context as well. When Hancock, acting as Frigitemp's agent, took the December 13 check for collection and credited Frigitemp's account to reduce its existing overdraft, the bank automatically obtained a security interest in the negotiable instrument, which would be liquidated only when the provisional credit was covered either by final payment of the check or a debit to Frigitemp's account. UCC 4–208.[2] Because the bank's security interest in the check and its proceeds was released when the provisional credit was repaid by debit memo on December 23, the estate was not depleted and no preferential transfer occurred. Whether a provisional credit is construed as a loan secured by the check, or simply as too "provisional" to be

---

**2.** The section provides that:

(1) A bank has a security interest in an item and any accompanying documents or the proceeds of either

(a) in case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied;

(b) in case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not

the credit is drawn upon and whether or not there is a right of charge-back; or

(c) if it makes an advance on or against the item. * * *

UCC 4–208. Application of provisional credit to reduce an existing overdraft equals a giving of value. See, e.g., *Lynnwood Sand and Gravel, Inc. v. Bank of Everett*, 29 Wash.App. 686, 630 P.2d 489 (1981).

treated as debt for bankruptcy purposes, see *In re A & C Chevrolet-Olds, Inc.,* 3 B.R. at 398, it cannot properly serve as the basis for preference liability.

The two cases cited by the parties are consistent with this holding. In *Davis v. Security National Bank,* 447 F.2d 1094 (9th Cir.1971), a livestock auction yard, as part of a kiting scheme, deposited drafts and checks which purported to be the proceeds of sales of livestock but were, in fact, fictitious. The bank extended provisional credit for the items, but when it discovered the fraud it arranged with the officers of the auction yard to charge back the returned drafts against new checks that the auctioneer agreed to deposit in the account. The bank acted with full knowledge of the fraud and with full knowledge that the subsequently deposited checks represented bonafide proceeds of livestock sales for which the sellers had not yet been paid. The peculiar facts of *Davis* take that transaction out of the realm of routine chargebacks of provisional credit. The bank in *Davis* flagrantly and knowingly dipped into the common pot for more than its share. In the other case, *In re Hudson Valley Quality Meats Inc.,* 29 B.R. 67 (Bkrtcy.N.D.N.Y. 1982), the insolvent company had drawn a check—on a bank account with insufficient funds—payable to its subsidiary, and the subsidiary had covered the provisional credit prior to collection of the check with a wire transfer from its account in another bank. The Bankruptcy Court ruled that the bank, by granting a provisional credit, did not become party to the transaction, which was between the drawer and the payee, and therefore received no preferential transfer. *Id.* at 77.

The decision in *In re Hudson Valley Quality Meats* is consistent with the UCC and with the exigencies of modern banking practice. Depositing a check in a bank account initiates a series of banking transactions governed by Article 4 of the UCC, the Federal Reserve Rules, and the Clearing House Rules, and involving depositary, collecting, and payor banks and the Federal Reserve and Clearing House system as well. Billions of dollars change hands each day "by means of abstract transactions involving bank debits and credits. Were 'hard cash' required for each of the transactions involved, the economy of this country would grind to a halt.... This fluidity of exchange is made possible by the country's 'banking system.' It provides the machinery and the personnel which makes the transfer of funds possible and workable." *Met Frozen Food Corp. v. National Bank of North America,* 89 Misc.2d 1033, 1034, 393 N.Y.S.2d 643, 645 (Sup.Ct.1977). The participating institutions have various duties of care, rights and responsibilities arising out of their respective roles. Depositary and collecting banks, however, act mainly as conduits in this collection process. *Id.* 393 N.Y.S.2d at 647 (quoting *Rock Island v. Empire Packing,* 32 Ill.2d 269, 273, 204 N.E.2d 721, 723 (Sup.Ct.Ill.1965). Debtor-creditor significance for bankruptcy purpose may not indiscriminately be attached to what are in the commercial world treated as automatic bookkeeping entries made solely to facilitate the collection process, and made explicitly provisional under the UCC.

Nothing in the record supports any suggestion that the bank deviated from its normal behavior in its relationship with Frigitemp, in connection with the $250,000 provisional credit. The credit was extended automatically on December 13, when Frigitemp deposited the $250,000 check, some six days before Hancock had constructive notice of Frigitemp's financial situation. Hancock had routinely granted provisional credit to Frigitemp, and the stopping of payment on this check was the first and only important breakdown in that arrangement. Hancock Bank called Frigitemp on the morning of December 19, and was reassured that the check would be replaced with a wire transfer which in fact arrived before the check was returned by MHT. Mr. Sutter did not request this transfer, and did not at the time have constructive knowledge of Frigitemp's condition. Finally, although Frigitemp received the wire transfer on December 20, the bank did not, in fact, erase the provisional credit by exercise

of its right of charge-back until December 23, when the check was returned through normal banking channels. The charge-back was merely the conclusion in the ordinary course, of a provisional credit transaction that was properly and fairly initiated and conducted, and was therefore exempt from treatment as a preference.

5. *Set-off of deposits in Frigitemp's Hancock accounts after December 19.* In addition to the $250,000 wire transfer, Frigitemp deposited a total of $480,000 in its accounts after December 19. Some of these funds were paid out again in the form of checks drawn by Frigitemp on its accounts, but the majority ultimately went to repay overdrafts and other debts owed by Frigitemp to Hancock. The trustee seems to claim that all the deposits after December 19 were preferential transfers, since they served to deplete the estate for Hancock's benefit. Hancock argues that, looking at the preference period as a whole, its overall position with respect to Frigitemp did not improve as a result of the net activity in the bank accounts and therefore it is protected by the "net result" rule. Hancock alternatively claims that it was entitled to set off the amounts deposited because the deposits were made in the regular course of business of both Frigitemp and the bank, and were not made with the bank's complicity for the purpose of preferring Hancock over other creditors.

For the reasons discussed earlier, in relation to Mr. Lefrak, the net result rule is of doubtful validity in the case of a creditor who had constructive notice of the debtor's insolvency. *See In re Ira Haupt & Co.,* 304 F.Supp. 917, 944–45 (S.D.N.Y.1969). The trustee, contending that overdrafts are bank loans, gives Hancock the benefit of the section 60(c) subsequent advance rule, basing its calculations on the improvement of Hancock's position between the time of

filing and December 19, the date of constructive notice of insolvency. The trustee correctly argues that Hancock's overdraft exposure of $369,034.42 on December 19, had become a positive balance of approximately $4,608.41 on January 9, and Hancock is thus ineligible for a § 60(c) rebate, since all advances of overdraft credit after December 19 were ultimately repaid through later deposits to the account.

 A bank, however, may debit the depositor's account to reduce indebtedness and still avoid preference liability if the bank acts within its statutory or common law right of set-off.[3] A bank's legal relationship to its depositor is one of debtor to creditor. A check drawn on the bank is an instruction to the bank to pay the holder a portion of its debt to the depositor. B. Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 2.1 (rev'd ed. 1981). A bank is entitled to set off its debt—sums credited to the depositor's account—against any matured mutual debt of the depositor. *See* Bankruptcy Act § 68; *Studley v. Boylston National Bank,* 229 U.S. 523, 33 S.Ct. 806, 57 L.Ed. 1313 (1913). As Judge Timbers explained in *Katz v. First National Bank:*

> [T]he traditional rule [is] that in order to prove a voidable preference [when a bank attempts to exercise its set-off rights] the trustee must show complicity or understanding on the part of the bank. This is in accordance with a long line of authority that a bank is entitled to set off deposits which were accepted in good faith and in the regular course of the bank's business. This rule in turn is premised on practical commercial considerations; it has survived the test of time; and, absent compelling reasons for doing so, it should not be disturbed.

568 F.2d 964, 967 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771.

**3.** Official Comment 1 to UCC 4–208 explains: Subsection (1) does not derogate from the banker's general common-law lien or right of set-off against indebtedness owing in deposit accounts.... Rather subsection (1) specifically implements and extends the principle as a part of the bank collection process.

Section 68 of the Bankruptcy Act provided that "[i]n all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor," the debts shall be set off against one another.

The right to set-off may not, of course, be used to disguise otherwise preferential payments. For example, a payment made specifically to reduce the principal on a note is preferential, even though it takes the form of a deposit in the bankrupt's account followed by a debit memo. *See Goldstein v. Franklin Square National Bank,* 107 F.2d 393 (2d Cir.1939). When deposits are made for the purpose of building up a debtor's inactive account with a view to repaying outstanding debt through the set-off mechanism, set-off also may be held preferential. *Katz v. First National Bank,* 568 F.2d 964 (2d Cir.1977), *cert. denied,* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771. *See Miller v. Wells Fargo Bank International Corp.,* 540 F.2d 548, 557 (2d Cir.1977).

The set-offs that occurred in this case related to three different kinds of transaction. First, Frigitemp and Hancock had a tacit agreement that Hancock would honor checks up to $50,000 drawn on insufficient funds without prior, specific approval. Second, the bank regularly allowed Frigitemp to overdraw its accounts by very substantial amounts, on the representation that Frigitemp was due a specifically identified payment in at least that amount, usually from Ingalls but sometimes from other sources, that would be deposited promptly to cover the large overdraft. This is the type of transaction that took place when Hancock agreed to pay an overdraft check of $250,000 on or about December 15, on the representation that a deposit of $315,000 was forthcoming within days from Frigitemp's subsidiary Elsters. Set-off of deposits against debts incurred in these types of transaction took place automatically as checks were deposited in the accounts. Finally, a third form of set-off was the January 9 prearranged debit to the corporate account to pay down the $500,000 Frigitemp demand note, held by the bank.

a. *Set-offs for routine overdrafts.* The automatic set-offs of deposits against routine overdrafts meet all the requirements necessary to exclude them from treatment as preferential payments. As noted, Hancock bank routinely allowed Frigitemp to overdraw its accounts and its practice was

to honor checks up to $50,000 without requiring advance clearance or confirming with Frigitemp that specific deposits were forthcoming to cover the overdraft. Transcript at 663. Of Frigitemp's total overdraft debt to Hancock on December 19, 1977, approximately $119,000 is attributable to such routine honoring of overdraft checks. The funds deposited from time to time by Frigitemp were automatically set off against this overdraft balance, also as a routine matter. Furthermore, these set-offs did not deprive Frigitemp of the capacity to draw on the funds deposited. Hancock did not set off the deposits against outstanding conventional debt but used them to balance out Frigitemp's checking accounts. The accounts were not frozen, and Frigitemp continued to write checks on the accounts, simultaneously with its deposits.

The overdraft declined rapidly after December 19, as deposits were made that exceeded withdrawals. Then, by January 9, 1978, the accounts reached the point where no overdraft existed, and no further overdrafts occurred. While these circumstances might seem indicative of an arranged paydown, that was not what happened in this case. Mr. Sutter, whose testimony and integrity was impressive, at no time after December 19 asked or demanded that Frigitemp pay down the overdraft in its accounts. The deposits were made by Frigitemp as they had been made in the past, and, as in the past, were automatically set-off by Hancock against existing overdraft balances. Furthermore, the decrease of activity in the accounts resulted from circumstances that were beyond Hancock's control. Ingalls Shipbuilding, deciding it wanted to monitor Frigitemp's disbursement of its progress payments, arranged that its checks be deposited in a bank located in the immediate vicinity of the marine construction plant. Thus it was Frigitemp and its customer who chose to shift their banking functions elsewhere and that shift is what led to the reduction in activity.

Hancock's application of checks deposited after December 19 to reduce over-

drafts in the Frigitemp accounts was a lawful set-off of Hancock's debt to Frigitemp (the sum deposited) against Frigitemp's debt to Hancock (the overdraft). *See In re A & C Chevrolet-Olds, Inc.,* 3 B.R. at 399; *Laurel Bank and Trust Co. v. City National Bank of Connecticut,* 33 Conn.Supp. 641, 365 A.2d 1222 (1976). The checks were not deposited to satisfy a specific indebtedness, as in *Goldstein v. Franklin Square National Bank,* 107 F.2d 393–94 (2d Cir.1939), and *Mayo v. Pioneer Bank & Trust Co.,* 270 F.2d 823, 836 (5th Cir.1959), *cert. denied,* 362 U.S. 962, 80 S.Ct. 878, 4 L.Ed.2d 877 (1960), but rather were part of the company's check collection and payment activity. Moreover, the deposits were in effect "withdrawable at the will of the depositor," *Joseph Hughes & Co. v. Machen,* 164 F.2d 983, 987 (4th Cir.1947) *cert. denied,* 333 U.S. 881, 68 S.Ct. 912, 92 L.Ed. 1156 (1948), in that account was never frozen and Hancock continued its practice of honoring routine overdrafts.

The cases cited by the trustee lend no support to his proposed treatment of routine deposits and set-offs as preferential transfers. In *Goldstein* the bankrupt had defaulted on a promissory note. On being reminded of its obligation, it made a deposit which was promptly debited. Moreover, although the court noted that the account had at times been overdrawn, no charge of preference was levelled against the balancing out of deposits against overdrafts. 107 F.2d at 393–94. In *Mayo* the challenged deposit was made with the purpose of repaying a loan. The lower court in the same case had refused to find that sums applied to balance out an overdraft constituted a transfer to the bank under either preference law or the Uniform Fiduciaries Act. The Fifth Circuit, in an opinion by Judge Wisdom, affirmed, reasoning that "Pioneer Bank did not in fact receive the $9,000 deposited in the checking account. . . . The funds were credited to the checking account of the [company] and were utilized to balance the account, including the payment of overdrafts." *Mayo v. Pioneer Bank and Trust Co.,* 270 F.2d at 832. In *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573 (1st Cir.1980), a one million dollar overdraft

was repaid not out of ordinary deposits but with the proceeds of secured loans from the bank. *Id.* at 575. Finally, in *Miller* the challenged deposit was marked "repayment of advance" and was pursuant to specific instructions to repay a conventional loan; the court noted that "the Bank at no time intended to treat the payments as ordinary deposits." 406 F.Supp. at 468.

Only two cases appear squarely to have addressed the issue whether the set-off of bank deposits against overdrafts is preferential. Both concluded that it was not. A Fourth Circuit opinion handed down in 1906 drew a distinction between the covering of ordinary bank debt and the covering of overdrafts and held that overdrafts were a part of the banking relation that should not be subject to preference law. *Tomlinson v. Bank of Lexington,* 145 F. 824, 828 (4th Cir.1906). More recently, a Michigan district court held that application of deposits to reduce the overdraft in the bankrupt's checking account was a nonpreferential set-off. *See In re A & C Chevrolet-Olds, Inc.,* 3 B.R. 396, 399 (D.C.E.D.Mich.1980).

The trustee creatively argues that Hancock's overdraft practices were the equivalent of conventional short term loans. The overdrafts unquestionably resulted in frequent, short-term extensions of credit, creating a continuing, average daily balance due Hancock, on which the bank charged 10% interest, amounting to over $2,000 in November 1977 alone. The clear intent of the parties was to effect a short term extension of credit in the event of a discrepancy between the arrival of deposits and checks. This form of credit, the trustee in effect contends, should be entitled to no greater protection under the bankruptcy law than credit extended by any merchant.

The trustee's argument is not wholly without appeal. The overdraft has proved to have enormous significance as a credit device. *See* Clark, *The Law of Bank Deposits, Collections and Credit Cards* ¶ 2.4[1] (rev'd ed. 1981) (discussing the advent of formal revolving "credit-check" accounts that incorporate the overdraft as a credit mechanism). "In their wildest dreams, the

drafters of Article 4 probably never suspected how pervasive overdraft banking, as authorized by Section 4–401(1), would become." *Id.* "[U]se of the bank check as a *credit* device apart from its *payment* function" occupies an increasingly important position in the consumer credit market. *Id.* Arguably, a bank charging for credit through the overdraft mechanism is in no different a position commercially than suppliers or contractors who extend short-term credit on goods. Arguing that banks engaged in this practice are selling a commodity like any other, the trustee seeks to have Hancock at least assume the same degree of risk and responsibility under section 60 as other types of creditors.

Compelling reasons exist, however, for protecting the established right of banks to set off deposits against overdrafts. The widespread, systematic use of overdrafts as a credit mechanism may be a recent development, but the overdraft has long been used as an adjunct to payment and collection services. A bank is authorized by law to honor any check presented that is properly payable even if in so doing it creates an overdraft. UCC 4–401. Under the UCC, a bank has several options when a check is drawn on insufficient funds: it may "rightfully" dishonor the check; or it may obtain a day's grace from the presenting bank if it believes the depositor will soon cover the check with a deposit, *see* UCC 4–108; or it may honor the check and allow an overdraft, *see* UCC 4–401; B. Clark, *supra,* ¶ 2.4. Banks have customarily charged interest on these overdrafts and they have been permitted to set off deposits against them. Extensions of overdraft credit are in fact often a necessary complement to a bank's other services. Overdraft privileges provide a cushion to absorb shortages due to error or imperfect cash management synchronization and such privileges prevent countless, needless dishonors of corporate checks for insufficient funds. If each routine deposit occurring when a company's account is in the overdraft position were

voidable as a preference, banks would potentially be exposed to substantial liabilities, or would modify their procedures by increasing the costs of preclearing checks for all customers, or by discontinuing the useful practice of permitting overdrafts. Moreover, attaching preference liability to overdrafts would lead to premature freezing of accounts. Like the termination of basic utilities, premature termination of such essential payment and collection services at the first suggestion of insolvency would turn many a lean spell for companies into sure bankruptcy. In the end, such a rule would hurt more creditors than it would help, "would in many cases make banks hesitate to honor checks given to third persons, would precipitate bankruptcy and so interfere with the course of business as to produce evils of serious and far-reaching consequence." *Studley v. Boylston National Bank,* 229 U.S. 523, 529, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913) (discussing the need to preserve bank's right of set-off).

The law provides extraordinary protections to credit exposure incurred in the performance of necessary banking services in recognition of their critical place in commercial transactions. Bank payment of overdrafts is authorized by UCC 4–401, and has much in common with provisional credit under UCC 4–212. A bank performs a fundamentally different role than other competing creditors when it uses credit as a mechanism to facilitate payment and collection. In fact, overdraft credit should not be equated with other forms of credit in bankruptcy law, since it typically goes to pay creditors who would otherwise become general creditors. *See Butz v. Bancohio National Bank,* 31 B.R. 893, 894 (Bkrtcy.S.D. Ohio 1983). The Bankruptcy Code provision that now governs such credit, and which was adopted after overdraft credit had become an established banking device, excuses current transactions from preference liability and makes banks liable for such overdrafts only to the extent they are not repaid within forty-five days.[4] *See Butz v.*

---

4. Although one court has held that repayments on a bank credit card are not covered by § 547

because they cannot be linked to any specific extension of credit, *In re Rustia,* 20 B.R. 131

*Bancohio National Bank,* 31 B.R. 893 (Bkrtcy.S.D.Ohio 1983); *In re Schmidt,* 26 B.R. 89 (Bkrtcy.D.Minn.1982). Though we are not bound by the Code to except overdraft credit from preference liability, the new law is surely an appropriate indication of the proper public-policy balance to strike in resolving the trustee's inventive claim.

 b. *Set-offs to satisfy overdrafts linked to specific subsequent deposits.* A second form of overdraft credit provided to Frigitemp by Hancock Bank appears on its face to fail the qualifying tests for traditional bank set-off. Hancock and Frigitemp established a practice whereby Frigitemp would identify checks about to be deposited for collection and request that Hancock honor checks drawn by Frigitemp in anticipation of these future deposits. The specific payment at issue took place on December 21, 1977 when Hancock received a $315,000 wire transfer from Elsters, Frigitemp's California subsidiary, in accord with a representation by Frigitemp to Mr. Sutter on or about December 15 that this item was about to be deposited. Hancock immediately set off this deposit against outstanding overdraft debt, including $250,000 extended to cover a check presented on December 16, that Hancock had honored in anticipation of receipt of these promised funds.

This set-off was consistent with the regular banking relationship of Frigitemp and Hancock. While the checks against which such extremely short-term extensions of credit were made came in general from Ingalls, Mr. Sutter testified without contradiction that checks promised by Frigitemp from other sources (including Elsters) also occasionally were the basis for these extensions of credit. Transcript at 747. On no occasion did Frigitemp fail to make the specific deposit promised to cover these overdrafts. On the other hand, one cannot accurately say that Frigitemp was free to draw upon these deposits after they were made. To the contrary, they were specifically identified as being intended to pay-

down a particular overdraft debt that Frigitemp had incurred and comparable fresh credit would only be extended if Frigitemp promised a new deposit. Hence, arguably, $250,000 of the $315,000 wire transfer from Elsters made on December 21, and immediately applied by Hancock to reduce Frigitemp's debt, was preferential.

A look at the true nature of this transaction reveals, however, that it is even less appropriate to treat this as a preference than routine set-offs to reduce short-term overdrafts. The reason one cannot say that Frigitemp was able to draw upon the deposit in question is that the arrangement was designed to enable Frigitemp to draw upon and use specific items to be taken for deposit *prior* to deposit, as soon as Frigitemp could confirm that the specific items were forthcoming. The transaction is therefore properly viewed as a "contemporaneous exchange for new value." *In re Schmidt,* 26 B.R. 89, 90 (Bkrtcy.D.Minn.1982) (deposits made between fifteen and thirty days after overdrafts were incurred constituted contemporaneous exchange under Bankruptcy Code § 547(c)). The rule of *Dean v. Davis,* 242 U.S. 438, 37 S.Ct. 130, 61 L.Ed. 419 (1917), preserved in the Bankruptcy Act § 60 (and Bankruptcy Code § 547(c)(1)), instructs courts to look to the intent of the parties in determining contemporaneity of exchange. Mr. Sutter testified without contradiction that Frigitemp would ask the bank to cover a check to suppliers or a payroll check "if [the weekly] check from Ingalls [did] not arrive in time" and that the Ingalls check was never issued later than the week in which Ingalls agreed to issue it. The checks were deposited within a matter of days and frequently bore dates prior to the date of deposit. Transcript at 479–80. The last Ingalls deposit recorded, for example, was made on December 14 to cover an overdraft of approximately $400,-000 created by four checks presented on December 13.

(Bkrtcy.S.D.N.Y.1982), this is not a problem in the context of overdraft credit. UCC 4–208(1) expressly establishes that overdraft checks are

to be deemed repaid on a "first-in, first-out basis." *See* UCC 4–208(1) and Official Comment 2.

This form of arrangement serves the same interests identified in connection with both provisional credits and routine overdrafts. While the bank was indeed extending credit, it was doing so as part of the crucial function of facilitating the payment and collection of checks and deposits. The legal rationale for protection is no less strong than the notion that protects normal overdrafts, where the bank is not treated as having "received" the money but rather as having applied it to balance out the depositor's account. See *Mayo*, 270 F.2d at 832.

Moreover, in these special circumstances, advance of bank credit in exchange for an identified item to be taken for deposit may even create a security interest in the identified items. As UCC 4–208(1)(c) makes clear, a bank may have a security interest in an "item" if the bank "makes an advance on or against the item."[5] *See also* UCC 9–203(1) (security interest attaches when there is agreement, when value is given, and when debtor has rights in the collateral); UCC 4–208(3)(a) (no security agreement is necessary to make an interest in checks taken for collection enforceable); UCC 9–203 (exceptions to requirement of possession for enforcement of security interest under UCC 4–208); UCC 9–305 (security interest perfected from time bailee receives notice of secured party's interest). One court has explicitly recognized that a loan made in expectation of future deposit of a specific instrument creates a security interest in that instrument under the terms of UCC 4–208(1)(c). *Bowling Green Inc. v.*

*State Street Bank and Trust Co.*, 425 F.2d 81, 87 (1st Cir.1970). This result gives the banks no greater protection, in essence, than traditional preference law gives to other suppliers. Thus, courts have recognized that a time lapse between an advance of funds and the delivery to the buyer or secured party of the goods or security does not destroy contemporaneity. In *First National Bank of Bay City v. Young's Estate*, 41 F.2d 8, 9 (6th Cir.1930), for example, lumber given in hypothecation for a cash advance was marked in the yard but not moved to the lender's property. The court held:

> When rights were exercised under [the agreement] by the advance of funds, the mere fact that delivery of the lumber was not made until somewhat later, but was then made pursuant to the contract, did not disclose bad faith or convert such delivery into a transfer for a past consideration.

41 F.2d at 10. An observation made by Chief Judge Weinstein is particularly apt in this connection, and emphasizes the fact that the form of exchange being considered here serves the same functions as provisional credit and routine overdrafts. An injection of cash in exchange for security has often "saved valuable business enterprises from destruction to the benefit of the creditors and others." *In re Hygrade Envelope Corp.*, 272 F.Supp. 451, 459 (E.D.N.Y.1967), *rev'd on other grounds*, 393 F.2d 60 (2d Cir.), *cert. denied sub nom. Gibraltar Fac-*

---

**5.** It is unclear whether a wire transfer is an "item" taken for "collection" under Article 4. *See* J. White and R. Summers, *Uniform Commercial Code* 646 (2d ed. 1980). Article 4 defines the term "item" broadly as "any instrument for the payment of money even though it is not negotiable [but] not includ[ing] money." UCC 4–104(g). Judge Gagliardi, discussing whether a telexed transfer was a "demand item", endorsed a non-restrictive interpretation of "item" that would encompass unsigned telexes. *Houston Contracting Co. v. Chase Manhattan Bank, N.A.*, 539 F.Supp. 247, 249 & n. 2 (S.D.N.Y.1982). The Second Circuit held that Article 4 does not control the somewhat different mechanism of CHIPS electronic transfers among banks, but provides useful analogous principles. *Delbrueck & Co. v. Manufacturer's*

*Hanover Trust Co.*, 609 F.2d 1047 (2d Cir.1979). Likewise, courts in other districts have applied Article 4 principles to assess the relationship between the initiator of a wire transfer and the correspondent bank which, in effect, takes the transfer for "collection." *Securities Fund Services, Inc. v. American National Bank and Trust Co. of Chicago*, 542 F.Supp. 323, 326–27 (N.D. Ill.1982). *See also* UCC 4–105 Official Comment 1 (Article 4 covers items issued to payee for collection, as where corporation transfers balances from one account to another). Whether as controlling law or by analogy, Article 4 indicates that Hancock's liabilities in advancing credit as part of its collection of a wire transfer be equated to the similar situation of a check taken for collection.

**1023**

*tors Corp. v. Baranow,* 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968). No legitimate goal of bankruptcy law is served by penalizing such short term extensions of ready credit whose primary purpose is to speed the flow of funds through the payment and collection process. Whether such transactions are viewed as a secured "advance" under 4–208(1)(c) or as an exchange of ready funds for a substantially contemporaneous deposit, the bank's receipt of the deposit promised by the customer is not a preferential transfer.

■ *c. Set-off to reduce outstanding demand note.* In late December, after having received constructive notice of Frigitemp's insolvency, Mr. Sutter arranged with Frigitemp officers that Frigitemp should begin to pay down the $500,000 note held by the bank since September 1977. Transcript at 422. The bank had charged Frigitemp interest on the note, but had never before attempted to exercise its power to demand payment. Frigitemp agreed to pay the note in $50,000 weekly installments, commencing during the first week of January 1978.

On January 9, 1978, after a period of relative inactivity in the Frigitemp accounts, a deposit of $60,000 was made. On the same day the bank debited $50,000 from the balance created by this deposit as Frigitemp's first payment on the note.

Neither the deposit nor the set-off was in the regular course of the banking relationship, since the accounts had become inactive. Furthermore, the parties had previously agreed that $50,000 of the deposit would be used to pay down the demand note, and these moneys were never intended to become available for withdrawal. This agreement was reached, moreover, at Hancock's request, after Hancock was on constructive notice of Frigitemp's insolvency, and the debit gave Hancock a preference by reducing the funds available in the estate to pay general creditors. Hancock therefore received a voidable preference of $50,000.

The Clerk will enter judgment in behalf of all the defendants involved in this proceeding, dismissing the trustee's claims with prejudice, except that judgment will be entered in the trustee's behalf and against Mr. Lefrak and his firm in the amount of $52,825.00, and against Hancock Bank in the amount of $50,000, with costs.

SO ORDERED.